**In re John CHIVERS, Debtor.**

**Skull Valley Band Of Goshute Indians, Plaintiff,**

v.

**John Chivers, aka Owen John Chivers, Defendant.**

**Bankruptcy No. 99B–28291. Adversary No. 99PB–2573.**

United States Bankruptcy Court, D. Utah, Central Division.

April 9, 2002.

Steven W. Call, Esq., Elaine A. Monson, Esq., Ray Quinney & Nebeker, Salt Lake City, UT, for the Goshutes.

Mona Lyman Burton, Esq., McKay Burton & Thurman, Salt Lake City, UT, for Chivers.

J. Kevin Bird, Esq., Bird & Fugal, Orem, UT, Chapter 7 Trustee.

## MEMORANDUM DECISION

JUDITH A. BOULDEN, Bankruptcy Judge.

The pending cross motions for summary judgment necessitate a determination of two underlying issues: first, the meaning of the term "financial condition" as used in

11 U.S.C. § 523(a)(2)(B);[1] and second, the interplay of *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) and the tort of fraudulent misrepresentation with § 523(a)(2)(A).

These issues arise as a result of the plaintiff Skull Valley Band of Goshute Indians' (the Band) motion for summary judgment on its First and Second Claims for Relief brought under §§ 523(a)(2)(A) and 523(a)(2)(B), respectively, and the cross motion for summary judgment seeking dismissal of the claims filed by John Chivers (Chivers), debtor and defendant herein. Both parties seek summary judgment on the merits.

The parties previously brought partial cross motions for summary judgment on the Band's Third Claim for Relief based upon the doctrines of claim and/or issue preclusion as a result of a civil jury verdict and resulting $625,000 judgment rendered by the United States District Court. The jury found that in obtaining money from the Band, Chivers had committed fraud as that term is defined under the fraud section of the Utah Securities Act and the Securities and Exchange Act of 1934, but found that Chivers was not liable to the Band under common law fraud. Both parties argued that the jury verdict supports judgment in their favor. This Court granted Chivers' motion for partial summary judgment and dismissed the Band's Third Cause of Action. Despite that ruling, both parties appear to reargue the prior motions.

After due consideration of the facts of the case, the parties' briefs and arguments, and following an independent review of applicable case law, the Court concludes that the $625,000 debt owed by Chivers to the Band is nondischargeable under § 523(a)(2)(A), but not § 523(a)(2)(B), and

declines to modify its ruling on the Third Claim for Relief. The basis for the decision is set forth below.

## FINDINGS OF FACT

The following facts are not in dispute, are deemed admitted pursuant to Local Rule 7056–1, or, if disputed, are not material:

1. The Band is a creditor of Chivers.

2. At all relevant times, Chivers was the president, officer, director and general agent of LE & B, Inc. (LE & B) and EnviroSolutions International, Inc. (EnviroSolutions), and therefore an insider of those entities pursuant to § 101(31).

3. In 1992, Chivers began to organize a solid waste management facility in Tooele County, Utah.

4. In November, 1992, members of the Band's Executive Committee, including their counsel, Danny Quintana (Quintana), traveled to Memphis, Tennessee to tour the Shelby Tissue Plant, an LE & B facility similar to the recycling and tissue facility Chivers anticipated would be located in Tooele County.

5. During the Band's November visit, Chivers, as president of LE & B, described to the Band his plans to construct and operate recycling facilities and tissue plants nationwide and in Tooele County.

6. Following the trip to Memphis, the Band decided not to invest in the Tooele facility at that time and notified Chivers of its decision.

7. Chivers and LE & B initiated construction of the Tooele Recycling Facility (Recycling Facility) in September, 1993, upon real property to which LE & B held title, and without an investment by the Band.

1. Future references are to Title 11 of the United States Code unless otherwise noted.

8. By December, 1993, construction of the Recycling Facility was well underway and Chivers was in need of cash to complete the facility, to retire the construction debt thereon, and to comply with certain bonding requirements.

9. During and after December, 1993, Chivers recommenced negotiations with the Band to invest in the Recycling Facility.

10. In January, 1994, Quintana and the Band's Executive Committee visited the Recycling Facility located in Tooele County. Employees at the facility were installing the recycle line, forklifts were moving about, light construction was underway, large trucks were in the vicinity, equipment was being installed, and a manager for the facility had been hired.

11. Around the January, 1994, visit, the Band was presented with a copy of a joint venture agreement between LE & B and National Ecology (Utah) Inc. dated January 14, 1994, along with a Precommercial Services Agreement, also dated January 14, 1994, which outlined certain services National Ecology would perform in order to begin recycling operations.

12. The Band was also presented with a tipping fee agreement that was entered into between LE & B and Tooele County.

13. Chivers represented to the members of the Band's Executive Committee that if the Band purchased stock in EnviroSolutions, the invested funds (which the parties concede was $750,000) would be used to pay the balance of the construction debts on the Recycling Facility, and that LE & B would then transfer assets, in particular the Recycling Facility, to EnviroSolutions.

14. Chivers does not dispute that he made the representation that $750,000 would be used to pay the balance of the construction debts, but does dispute that $750,000 would satisfy the indebtedness.

15. Chivers testified during his October 29, 2001, deposition that EnviroSolutions would assume the liabilities of LE & B and that LE & B invested nearly $800,000 to receive a 50% interest in EnviroSolutions.

16. Chivers sent a letter to Quintana dated February 25, 1994, (the Letter)[2] referencing as its subject the "Tooele Tissue Mill Funding." However, the Letter referenced both the nearly completed Recycling Facility and a proposed Tooele Tissue Facility (Tissue Facility) that was never constructed. A copy of the Letter was forwarded to the Band's Executive Committee.

17. Chivers represented in the Letter that: (1) "LE & B has expended over two million dollars ($2,000,000) and is totally committed to building this facility during this year with operations beginning early 1995. This facility will be very similar to the Memphis, Tennessee facility you visited last year;" (2) "We have arranged Brazilian export financing for the paper machine and have yet to utilize the twenty-two million dollars ($22,000,000) in tax free bonds;" and (3) "Our credit enhancement from our credit bank for the initial four million five hundred thousand dollars ($4,500,000) for the recycle facility has been approved. The recycle facility construction is complete and the equipment is being tested."

18. Chivers' representations in the Letter that LE & B had expended over $2,000,000 on the "facility," and that LE &

2. Two letters exist dated February 25, 1994, which differ in reference to the amount to be invested and the equity interest to be ac-
quired, but are identical regarding the issues related to this proceeding.

B had obtained a credit line for the Recycling Facility in the amount of $4,500,000 were false.

19. The purported Brazilian export financing for the paper machine and $22,000,000 in tax free bonds related to the Tissue Facility, not to the Recycling Facility.

20. In February, 1994, Chivers and Quintana, at the direction of the Band's Executive Committee, began negotiating a shareholders agreement relating to the Band's investment in EnviroSolutions.

21. On March 7, 1994, an Amended Shareholders Agreement (Agreement) was executed by the Band and EnviroSolutions whereby the Band invested money in EnviroSolutions for use in the Recycling Facility. The Agreement provided that the Band would obtain 150,000 shares in EnviroSolutions for the invested sum of $750,000, of which $100,000 was to be paid upon the execution of the Agreement, another $100,000 to be paid by May 15, 1994, and the remaining $550,000 to be paid by October 30, 1994. The Agreement also contained an early payoff provision, previously negotiated, whereby if the Band paid the $625,000 by July 1, 1994, their equity ownership in EnviroSolutions would increase from 25% to 30%.

22. The Agreement reflected that EL & B owned or had an option to purchase 325,000 shares, or approximately 50% of EnviroSolutions.

23. The Band relied upon Chivers' false representations in the Letter in its determination to invest in EnviroSolutions.

24. The Band relied upon Chivers' representations that the Recycling Facility and other assets would be transferred into EnviroSolutions in exchange for the Band's investment.

25. National Ecology's participation in the Tooele project, which subsequently terminated, was but one factor in the Band's decision to invest in EnviroSolutions.

26. The Recycling Facility was completed in early March, 1994, and all debt incurred in connection with the construction of the project was incurred by that time.

27. Between March 29, 1994, and December 8, 1994, the Band made payments toward its investment in EnviroSolutions.

28. The Band did not complete all of the payments timely, but by October 30, 1994, the Band had substantially performed under the Agreement by investing $679.285.21. By December 8, 1994, the Band had invested approximately $759,233.

29. On April 11, 1994, Chivers faxed to Quintana a ten year projection for the "Tooele M.S.W. Reduction & Recycling Facility." ("M.S.W." stands for Municipal Solid Waste.) In addition to other figures, the projection lists debt service of $466,000 per year from year one through year ten.

30. Quintana understood that the projected debt service related to the bond issues in reference to the yet-to-be-constructed Tissue Facility which also included a recycle facility.

31. The Band was aware that there was approximately $750,000 in outstanding debt on the Recycle Facility as a result of receiving a "List of Debts" of EnviroSolutions dated May 31, 1994, which stated that "Total Direct Debt" of EnviroSolutions was $757,907, and that the indirect "LE & B Construction Costs" were $638,492, for a "Total Project Debt" of $1,396.399.

32. Mechanics' liens totaling approximately $1,000,000 were filed on the Recycling Facility in June, 1994.

33. In December, 1994, LE & B filed a bankruptcy petition. The statements and

schedules filed therewith listed title to the Recycling Facility as an asset of LE & B.

34. From April 1, 1994, through December, 1994, the only asset held by EnviroSolutions was the bank account containing cash contributed by the Band.

35. The Band sued Chivers in the United States District Court for the District of Utah (District Court Action). After trial, a jury verdict was rendered based upon a preponderance of the evidence standard of proof, finding Chivers liable to the Band for violation of Federal Securities Law under Regulation 10(b)–5 and U.C.A. § 61–1–1. The jury found, utilizing a clear and convincing standard of proof, that Chivers was not liable to the Band for common law fraud. On June 17, 1999, the District Court issued a judgment in favor of the Band and against Chivers for $625,000 plus interest at a rate of twelve percent (12%) per year from September 13, 1994. (District Court Judgment).

36. Chivers filed a petition seeking relief under Chapter 7 on August 5, 1999.

37. The Band timely filed this proceeding under §§ 523(a)(2)(A) and (B) seeking to have the $625,000 District Court Judgment determined nondischargeable.

From the forgoing Findings of Fact, the Court makes the following:

### CONCLUSIONS OF LAW

#### A. *Jurisdiction and Burden of Proof*

The matters in the cross motions for summary judgment are core as set forth in 28 U.S.C. § 157(b)(2)(I). Therefore, pursuant to 28 U.S.C. §§ 157(b) and 1334, and DUCivR 83–7.1(a), which automatically refer bankruptcy cases and proceedings to this Court for hearing and determination, this Court can enter a final order.

To prevail on their motions, the parties must demonstrate the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Gossett v. Okla. ex rel. Bd. of Regents*, 245 F.3d 1172, 1175 (10th Cir.2001); Fed. R. Bankr.P. 7056(c). If the moving party does not bear the ultimate burden of persuasion at trial, "it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claims.'" *Cassara v. DAC Services, Inc.*, 276 F.3d 1210, 1213 (10th Cir.2002)(citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998)). For each of the nonmovants to avoid summary judgment, they must establish an inference of the presence of each element essential to the case. *Id.* The court must make its determination drawing all reasonable inferences in the light most favorable to the nonmoving party. *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir.1995).

 Discharge provisions will be strictly construed against the creditor and liberally construed in favor of the debtor. *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir.1997). In order to prevail on a nondischargeability action under §§ 523(a)(2)(A) or (B), the creditor must prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)(holding that preponderance of the evidence standard, rather than clear and convincing standard, applies to all exceptions to discharge); *Nelson v. Tsamasfyros (In re Tsamasfyros)*, 940 F.2d 605, 607 (10th Cir.1991)(stating that the preponderance of the evidence standard applies to all exceptions to the dischargeability of debts set forth in § 523).

#### B. *Section 523(a)(2)(B)*

 Section 523(a)(2)(B) provides that a debtor is not entitled to a discharge if the

debt was incurred: (1) using a written statement; (2) that is materially false; (3) respecting the debtor's or an insider's financial condition; (4) on which the creditor reasonably relied; and (5) that the debtor caused to be made or published with the intent to deceive. *Salim Investments, Ltd. v. Benton (In re CSI Enterprises, Inc.)*, No. 98–1478, 2000 WL 93989, at *4 (10th Cir. Jan.28, 2000).

### 1. Meaning of "Financial Condition"

■ The parties dispute whether the Letter from Chivers to Quintana and the Band's Executive Committee containing the false statements that LE & B had expended over $2,000,000 on the "facility," and that LE & B had obtained a credit line for the Recycling Facility in the amount of $4,500,000, constituted statements respecting an insider's financial condition under § 523(a)(2)(B)(ii). Because the term "financial condition" is not defined in the Bankruptcy Code, *Beneficial Nat'l Bank v. Priestley (In re Priestley)*, 201 B.R. 875, 882 (Bankr.D.Del.1996), courts have developed both broad and strict interpretations of what constitutes a statement respecting financial condition. *See Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 501–05 (Bankr.S.D.N.Y.1999)(setting forth both broad and strict interpretations of statements respecting financial condition and cases in support thereof); *accord Jokay Co. v. Mercado (In re Mercado)*, 144 B.R. 879, 881–86 (Bankr.C.D.Cal.1992).

Historically, the broad interpretation of the term was the prevailing viewpoint. *See e.g. Engler v. Van Steinburg (In re Steinburg)*, 744 F.2d 1060 (4th Cir.1984);[3] *Conn. Nat'l Bank v. Panaia (In re Panaia)*, 61 B.R. 959 (Bankr.D.Mass.1986); *King v. Prestridge (In re Prestridge)*, 45 B.R. 681 (Bankr.W.D.Tenn.1985); *but cf. Nagin Mfg. Co. v. Pollina (In re Pollina)*, 31 B.R. 975 (D.N.J.1983). Under the broad interpretation, statements respecting financial condition are those written " 'statements concerning the condition or quality of a single asset or liability impacting on the debtor's financial picture.' " *Alicea*, 230 B.R. at 502 (citing *Priestley*, 201 B.R. at 882). Statements concerning conditions to purchase of an asset, ownership of particular property, indebtedness to a creditor and encumbrances on assets are included in this definition. *Id.* at 502–03. This viewpoint emphasizes that Congress did not limit the statutory language to false "financial statements," but instead referred to an arguably broader class of statements relating to financial condition.

**3.** *Engler* arose from a debtor's oral statement that the court determined related to his financial condition, and the associated debt was thus found dischargeable. Much like the case at bar, *Engler* turned on whether a statement that an asset was not encumbered was or was not a statement regarding financial condition. In *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir.1997), the Tenth Circuit cited *Engler* with favor, quoting that portion of the opinion stating:

> But Congress did not speak in terms of financial statements. Instead it referred to a much broader class of statement—those 'respecting the debtor's ... financial condition.' A debtor's assertion that he owns

certain property free and clear of other liens is a statement respecting his financial condition. Indeed, whether his assets are encumbered may be the most significant information about his financial condition. Consequently, the statement must be in writing to bar the debtor's discharge.

*Id.* at 1361. When cited in *Kaspar*, the point was that a statement must be in writing, and about financial condition, to be nondischargeable. Even though the quoted language in *Engler* is specifically on point and could indicate an intent on the part of the Tenth Circuit to adopt the broad interpretation of financial condition, it does not appear that the Court focused on what constituted financial condition, but rather on what constituted a writing.

The emerging viewpoint follows a strict interpretation. *Id.* at 503; *Mercado,* 144 B.R. at 885; *Old Kent Bank—Chicago v. Price (In re Price),* 123 B.R. 42 (Bankr. N.D.Ill.1991). Although it does not require any specific formality, the strict interpretation limits an actionable statement of financial condition to financial-type statements including balance sheets, income statements, statements of changes in financial position, or income and debt statements that provide what may be described as the debtor or insider's net worth, overall financial health, or equation of assets and liabilities. *Alicea,* 230 B.R. at 502. Cases supporting this view generally recite four arguments. First, they argue that the normal commercial meaning and usage of "'statement' in connection with 'financial condition' denotes either a representation of a person's [an entity's] overall 'net worth' or a person's [an entity's] overall ability to generate income." *Mercado,* 144 B.R. at 885. Second, they cite to legislative history that references the statutes' application to the "'so-called false financial statement.'" *Alicea,* 230 B.R. at 502; *Mercado,* 144 B.R. at 883 (citing statements of Rep. Edwards and Sen. DeConcini for the proposition that "it seems more plausible that Congress intended application of § 5234(a)(2)(B) to be limited to 'the so-called false financial statement.'"). Third, they argue that the strict interpretation promotes better bankruptcy policy, because narrowing the definition of financial condition in § 523(a)(2)(B) necessarily expands those statements, both written and oral, that do not relate to financial condition that fall within § 523(a)(2)(A) and better harmonizes the statute. *Bal–Ross Grocers, Inc., v. Sansoucy (In re Sansoucy),* 136 B.R. 20, 23 (Bankr.D.N.H.1992). Finally, they argue that a strict interpretation is consistent with the historical basis of § 523(a)(2)(B), which was designed to protect debtors from abusive lending practices. *Field,* 516 U.S. at 76–77, 77 n. 13, 116 S.Ct. 437 (1995).

This Court is not persuaded that either interpretation is without its perils. However, the strongest argument in favor of the broad interpretation—that had Congress wanted § 523(a)(2)(B) limited to false financial statements, it would have so drafted the statute—is gutted by the Supreme Court's repeated statements in *Field v. Mans* that § 523(a)(2)(B) refers to false financial statements. *Field,* 516 U.S at 64–65, 65 n. 6, 76, 116 S.Ct. 437. While it might be convenient to dismiss *Field's* repeated references to false financial statements as *dicta, Field's* meticulous comparison of §§ 523(a)(2)(A) and (B) does not lend itself to that interpretation. Rather, it makes it more difficult to dismiss as unintentional the recharacterization of "a statement in writing . . . respecting . . . financial condition" as a false financial statement. Lastly, *Field's* recitation of the history of § 523(a)(2)(B) and its goal of preventing abuse by consumer finance companies, which sometimes have encouraged false financial statements by their borrowers for the purpose of insulating their own claims from discharge, lends strong support for adoption of the strict interpretation. *Id.* at 76–77, 116 S.Ct. 437.

Therefore, the better approach is the strict interpretation of § 523(a)(2)(B) that requires a false written statement to describe the debtor's net worth, overall financial health, or ability to generate income. It is the most consistent with the Supreme Court's interpretation of the statute, it is consistent with the history of the reason for the creation of the statute, it strictly construes § 523(a)(2)(B) against the creditor and liberally in favor of the debtor, and it resolves the conflict raised in the present case in a way that reconciles

§§ 523(a)(2)(A) and (B) without impairing their effectiveness. *Sansoucy*, 136 B.R. at 23 (Bankr.D.N.H.1992); *accord Zimmerman v. Soderlund (In re Soderlund)*, 197 B.R. 742, 746 (Bankr.D.Mass.1996)("Either interpretation could bring forth a parade of imaginary horribles, but, on balance, I believe that less harm is done by adopting the more restrictive meaning of the phrase [financial condition].").

### 2. Application of § 523(a)(2)(B)

■ Once the strict interpretation of § 523(a)(2)(B)(ii) is applied to the Letter from Chivers to Quintana and the Band's Executive Committee, it is apparent that the Letter does not constitute a statement respecting an insider's financial condition. Chivers' written statements that LE & B had expended over $2,000,000 on the facility and that LE & B had obtained a credit line of $4,500,000 for the Recycling Facility are not statements relating to an insider's financial condition. They do not describe the Recycling Facility, EnviroSolutions, or LE & B in any context that could lead to a determination of the net worth, overall financial health, or ability to generate income. A statement that over $2,000,000 was expended on the facility does not, in and of itself, provide any context as to the overall value of the Recycling Facility that was to be transferred to EnviroSolutions, and is not juxtaposed by a statement of encumbrances against the Recycling Facility. Likewise, a statement that LE & B obtained a line of credit could indicate both an asset and a liability. These statements, without more, did not offer the Band any information about EnviroSolutions or LE & B's net worth, overall financial health or overall ability to generate income. In fact, in this context it is difficult to ascertain the entity to which the false statements would apply. Do they purport to describe the financial condition of LE & B, EnviroSolutions, or both?

Moreover, the Band's Second Claim for Relief brought under § 523(a)(2)(B) relates solely to money that was to be applied through EnviroSolutions to the Recycling Facility. Nevertheless, the only reference to the Recycling Facility in the Letter is to the line of credit allegedly obtained by LE & B. There are no representations in the Letter as to net worth, overall financial health, or ability to generate income of LE & B, EnviroSolutions, or the Recycling Facility project. The majority of the Letter references the yet-to-be constructed Tissue Facility and financial dealings related to that project—or, information which further militates against its use as a statement respecting overall financial condition. Financial projections are referenced and attached to the Letter; however, they relate to the "Project Cost" of the "60 Ton Mill," not the Recycling Facility. Therefore, the Letter and its accompanying financial projections did not provide any information whereby Chivers can be charged with representing, nor could one decipher, the financial condition of LE & B, EnviroSolutions or the Recycling Facility project for the purposes of § 523(a)(2)(B). Accordingly, there are no material issues of disputed fact, and Chivers is entitled to summary judgment dismissing the Band's Second Claim for Relief brought under § 523(a)(2)(B), and the Band's Motion for Summary Judgment is denied.

### C. *Section 523(a)(2)(A)*

The Band's First Claim for Relief under § 523(a)(2)(A) alleges that Chivers obtained $750,000 through the false statement that for the Band's investment in EnviroSolutions, he would cause the Recycling Facility to be transferred to EnviroSolutions. The Band seeks summary judgment on its First Claim for Relief determining that the District Court Judg-

ment is nondischargeable based on the undisputed facts and, in part, on the doctrine of collateral estoppel or issue preclusion.

### 1. Collateral Estoppel

In the District Court Action, Chivers was found to have violated Rule 10(b)–5 of the Federal Securities Act and § 61–1–1 of the Utah Securities Act (collectively, "the Securities Acts"). Culpability under the Securities Acts requires, in general, that a person make a false statement of material fact or omit to state a material fact.[4] Thus, the Band argues that Chivers is collaterally estopped from relitigating issues previously determined to constitute a violation of the Securities Acts.

Earlier in these proceedings, Chivers sought summary judgment on the Band's Third Claim for Relief that seeks declaratory relief upon the theory that the District Court Judgment is preclusive of the Band's § 523(a)(2)(A) claim. In response, the Band asserted that summary judgment should be granted in its favor on its Third Claim for Relief because the Securities Acts violations satisfied the provisions of § 523(a)(2)(A). Relying upon the three part test in *Klemens v. Wallace (In re Wallace)*, 840 F.2d 762 (10th Cir.1988), this Court ruled that the Band had presented insufficient evidence to determine what statements the jury found to be fraudulent, whether the statements the jury found to be fraudulent related to financial condition, or what statements constituted false representations under the Securities Acts. Based thereon, the Band's motion for declaratory relief was denied and Chivers' motion to dismiss the Band's Third Claim for Relief was granted. Although raised by the Band again in the pending motion for summary judgment, no new evidence was presented to satisfy the concerns raised in the prior ruling that the issues litigated in the District Court Action were identical to the issues in this proceeding. Therefore, to the extent the Band seeks to have this Court revisit that issue previously ruled upon in relation to the Third Claim for Relief, it declines to do so.[5]

---

4. Rule 10(b)–5. Employment of Manipulative and Deceptive Devices.

 It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or the mails, or of any facility of any national securities exchange, .
 (1) to employ any device, scheme, or artifice to defraud,
 (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
 (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon nay person,
 in connection with the purchase or sale of any security.
 Securities Act of 1934 § 10(b)–5.
 61–1–1. Fraud Unlawful

 It is unlawful for any person, in connection with the offer, sale, purchase of any security, directly or indirectly to:
 (1) employ any device, scheme, or artifice to defraud;
 (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or
 (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
 Utah Code Ann. § 61–1–1.

5. The Band attached the complaint in the District Court Action to their complaint in this action. The allegations of fraudulent misrepresentation and omission in the District Court Action complaint cover numerous representations and omissions that could be construed as statements describing Chivers'

Chivers also argues that collateral estoppel requires that summary judgment be granted in his favor on the Band's First Claim for Relief. Chivers argues that allegations of false representations and false pretenses are subsumed in the elements of actual fraud. Because the jury in the District Court Action did not find him liable under common law fraud, Chivers argues that his actions cannot now be found to fall within the purview of § 523(a)(2)(A).

The Special Verdict Form in the District Court Action required the jury to find that Chivers had committed common law fraud by clear and convincing evidence. *Bailey v. Hazen (In re Ogden),* 243 B.R. 104, 113–14 (10th Cir.BAP2000)(recognizing the elements in *Pace v. Parrish,* 122 Utah 141, 247 P.2d 273, 274–75 (1952) as the standard for fraud in Utah and acknowledging the clear and convincing standard). In order to prevail on a nondischargeability action under § 523(a)(2)(A), the creditor must prove each element by a preponderance of the evidence. *Grogan,* 498 U.S. at 286–91, 111 S.Ct. 654 (holding that preponderance of the evidence standard, rather than clear and convincing standard, applies to all exceptions to discharge). Collateral estoppel or issue preclusion is foreclosed when there are disparate burdens of proof in the state and bankruptcy forums. *Matosantos Comm'l Corp. v. Applebee's Int'l, Inc.,* 245 F.3d 1203, 1212 (10th Cir.2001)("Collateral estoppel is also not appropriate when a party in a subsequent suit faces a less demanding burden of proof than the burden of proof in the prior litigation."). In construing § 523(a)(2)(A), this court must apply federal law. *In re Braen,* 900 F.2d 621, 626 n. 3 (3d Cir.1990)("The exceptions to the general rule of dischargeability are federal substantive law. . . ."). Therefore, while the evidence against Chivers in the District Court Action was insufficient to meet the clear and convincing standard, it may be sufficient to meet the lesser preponderance standard in order to satisfy the requirements of § 523(a)(2)(A). Accordingly, Chivers' motion for summary judgment, premised upon issue preclusion as a result of the jury verdict that failed to find common law fraud by clear and convincing evidence, is denied.

### 2. Application of § 523(a)(2)(A)

Section 523(a)(2)(A) provides that a debt is nondischargeable to the extent money or property is obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. § 523(a)(2)(A). In *Field v. Mans,* the Supreme Court established that the terms within § 523(a)(2)(A) should be interpreted according to the common understanding of those terms at the time the statute was enacted. *See Field,* 516 U.S. at 70, 116 S.Ct. 437. To define actual fraud, the Supreme Court looked to the definition of fraudulent misrepresentation found in the Restatement (Second) of Torts (1976) (Restatement):

> Since the District Court treated [Defendant's] conduct as amounting to fraud, we will look to the concept of "actual fraud" as it was understood in 1978

or one of the insider's net worth, overall financial health, or ability to generate income. The Special Verdict Form is not specific as to what representations or omissions the jury found to be actionable. Therefore, it is impossible to determine if the issue litigated in the District Court Action was identical to the issue here or, if instead, it related to a state-

ment respecting Chivers' or an insider's financial condition. *Missouri v. Audley (In re Audley),* 275 B.R. 383, 388 (10th Cir. BAP 2002) (stating that for collateral estoppel to apply, elements of state court ruling must be the same as elements of § 523(a)(2)(A) and must be found by the same standard of proof.)

when that language was added to § 523(a)(2)(A). Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the [Bankruptcy Reform] Act [of 1978].

*Field,* 516 U.S. at 70, 116 S.Ct. 437.

Following the Supreme Court's emphasis on the Restatement to discern the meaning of § 523(a)(2)(A), reference is made to the Restatement's definition of the tort of fraudulent misrepresentation:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

RESTATEMENT (SECOND) OF TORTS § 525 (1976). *AT & T v. Mercer (In re Mercer),* 246 F.3d 391, 403 (5th Cir.2001)(applying the Restatement to § 523(a)(2)(A), but acknowledging that the Restatement does not define "fraud," and instead discusses "fraudulent misrepresentation"); *Foley &*

*Lardner v. Biondo (In re Biondo),* 180 F.3d 126, 134 (4th Cir.1999)(setting forth the four elements found in the Restatement: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation); *Chevy Chase Bank FSB v. Kukuk (In re Kukuk),* 225 B.R. 778, 784 n. 5 (10th Cir. BAP 1998)(suggesting that an accurate analysis of a § 523(a)(2)(A) cause of action begins with the Restatement rather than the five point test set forth in *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir.1996)).[6] The standard of proof of each element is by a preponderance of the evidence. *Grogan,* 498 U.S. at 291, 111 S.Ct. 654.

#### a. Verbal Representations Under § 523(a)(2)(A)

■ The Band asserts that Chivers knowingly and fraudulently represented that in exchange for a $750,000 investment in EnviroSolutions for 25% of the stock in that company, Chivers would transfer assets, and in particular the Recycling Facility, to EnviroSolutions. It is undisputed

---

**6.** Although *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367 (10th Cir.1996) bears a date of July 26, 1996, it inexplicably fails to reference *Field v. Mans,* which was issued the prior November 28, 1995. However, a comparison of the Restatement and *Young's* five point test demonstrates the similarities. In *Young* the standard is as follows: (1) the debtor made a false representation; (2) the representation was made with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was [justifiable]; and (5) the debtor's representation caused the creditor to sustain a loss. *Young,* 91 F.3d at 1373; *Kukuk,* 225 B.R. at 784 n. 5. The Restatement, on the other hand, requires a fraudulent misrepresentation, which is inclusive of *Young's* first and second elements. A fraudulent misrepresentation specifically incorporates scienter. While not specified in *Young,* scienter has

been included by inference by courts following *Young. See Audley,* 275 B.R. at 388 (stating that the elements of *Young* include that the debtor *knowingly* committed actual fraud or false pretenses, or made a false representation or willful misrepresentation). Some courts use knowledge and intent to deceive interchangeably with or as a substitute for the scienter requirement under the Restatement. 2 DAN B. DOBBS, THE LAW OF TORTS § 471 (2001); *Palmacci v. Umpierrez,* 121 F.3d 781, 786–87 (1st Cir.1997)(stating that scienter under the Restatement requires an intent to deceive, manipulate, or defraud). *Young's* third and fourth points, the creditor's justifiable reliance upon the debtor's representation, mirrors the Restatement's requirement that the target justifiably relies upon the tortfeasor's misrepresentation. *Young's* last point, causation and loss, differs only in that the Restatement requires pecuniary loss.

that the Recycling Facility was never transferred to EnviroSolutions. In light of the prior interpretation of § 523(a)(2)(B), this misrepresentation does not constitute a statement of financial condition. Although Chivers clearly contests the element of justifiable reliance, there is some ambiguity in Chivers' pleadings as to the extent to which he contests the other elements of § 523(a)(2)(A). Therefore, analysis of the allegedly fraudulent misrepresentation under § 523(a)(2)(A) is appropriate.

### (1) Fraudulent Misrepresentation

▆▆▆▆ Comment "a" to Restatement § 525 directs reference to Restatement §§ 526 through 545 in reviewing the various elements of liability for fraudulent misrepresentation. RESTATEMENT (SECOND) OF TORTS § 525, cmt. a (1976).[7] In order to qualify as a fraudulent misrepresentation, the representation must be supported by the element of scienter. RESTATEMENT (SECOND) OF TORTS § 526 (1976). Scienter is an inherent element of a § 523(2)(A) action. *Field*, 516 U.S. at 67–68, 116 S.Ct. 437 (stating that application of the negative pregnant rule in imputing § 523(a)(2)(B) requirements to § 523(a)(2)(A) would eliminate scienter from the very notion of fraud); *Kukuk*, 225 B.R. at 786 (discussing Restatement § 526 and Comment a); *John Deere Co. v. Gerlach (In re Gerlach)*, 897 F.2d 1048, 1049 (10th Cir.1990)(discussing that the debtor *knew* certain loan applications would be rejected); *Missouri v. Audley (In re Audley)*, 275 B.R. 383, 388 (10th Cir. BAP 2002) (debtor must *knowingly* commit actual fraud, false pretenses or make a false representation); *Church v. Hanft (In re Hanft)*, 274 B.R. 917, 921–22 (Bankr.S.D.Fla.2002) (listing the ways in which scienter may be established); *Sperry Concrete, Inc. v. Voisine (In re Voisine)*, No. 00–10251, 2002 WL 181985, at *7(Bankr.D.N.H. Jan.25, 2002)(stating the ways in which the scienter requirement of § 523(a)(2)(A) may be met); *State Bank of Springhill v. Davis (In re Davis)*, 18 B.R. 301, 305 (Bankr.D.Kan.1982)(providing that the scienter standard in Kansas is substantially similar to that of § 523(a)(2)(A)).

It is undisputed that prior to the Agreement, Chivers represented to the Band that in exchange for the Band's $750,000 investment in EnviroSolutions, LE & B would transfer to EnviroSolutions a variety of assets, including title to the Recy-

---

7. A representation may be fraudulent if: "[I]f the maker of the representation '(a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows that he does not have the basis for his representation that he states or implies.'" *Palmacci*, 121 F.3d at 787(citing Restatement, § 526); *Westway Partners v. Luthi (In re Luthi)*, 1991 WL 191071, at *1 (10th Cir.1991) (debt incurred by debtor who signed contract without any reasonable hope of being able to fulfill its term was nondischargeable because debtor knew at the time he made the representation it was false). In addition, a misrepresentation may be fraudulent if the maker knows the representation may be capable of two inter-pretations, one of which he knows to be false and the other true if made: (a) with the intention that it be understood in the sense in which it is false, or (b) without any belief or expectation as to how it will be understood, or (c) with reckless indifference as to how it will be understood. Restatement § 527. A representation that states the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation. Restatement § 529. Finally, a representation is fraudulent that expresses the maker's own intention to do or not to do a particular thing if he does not have that intention. Restatement § 530.

cling Facility, and that the $750,000 would be used to pay the balance of the construction debts on the Recycling Facility. Despite Chivers' argument that Quintana and the Band should have known that $750,000 would not have been sufficient to pay the balance of the debt on the Recycling Facility, Chivers has not disputed that he actually made the representation that the Recycling Facility would be transferred to EnviroSolutions. It follows then that Chivers made a misrepresentation of fact, inasmuch as Chivers now admits that $750,000 was never sufficient to pay the balance of the debt on the Recycling Facility. Thus, Chivers knew that he did not have the basis for his representation that he could transfer the Recycling Facility to EnviroSolutions. *See* RESTATEMENT (SECOND) OF TORTS § 526 (1976). Further, Chivers' statement to the Band that payment of $750,000 would pay the construction debt, without stating that the funds would be insufficient to pay the remainder of the debt and thus enable the Recycling Facility to be transferred to EnviroSolutions, was misleading because it was incomplete. RESTATEMENT (SECOND) OF TORTS § 529 (1976). Therefore, there are no material disputed facts that Chivers made a fraudulent misrepresentation.

### (2) Inducement

Chivers' representations were also made for the purpose of inducing action on the part of the Band. Section 531 of the Restatement provides:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

RESTATEMENT (SECOND) OF TORTS § 531 (1976); *Merchants Nat'l Bank v. Moen (In re Moen)*, 238 B.R. 785, 792–93 (8th Cir. BAP 1999).

Furthermore, Restatement § 531, Comment c, provides:

> A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct. Thus one who believes that another is substantially certain to act in a particular manner as a result of a misrepresentation intends that result, although he does not act for the purpose of causing it and does not desire to do so.

RESTATEMENT (SECOND) OF TORTS § 531, cmt. c (1976)(internal citation omitted).

Here, Chivers' fraudulent misrepresentation was made when he was aware that the Band had a prior interest in investing in the Recycling Facility, as evidenced by their 1992 visit to the Memphis, Tennessee facility. He was also aware at the time he and Quintana began their discussions about the Recycling Facility that EnviroSolutions was facing financial difficulties, including the restlessness of creditors used in constructing the Recycling Facility— creditors who would ultimately file approximately $1,000,000 in mechanics' liens on the Recycling Facility just six months later in June, 1994. In addition, the representation was made to the Band about the same time that Chivers sent the Letter, and before the resulting Agreement between LE & B and the Plaintiff. Therefore, it is reasonable to conclude that Chivers was aware that his fraudulent misrepresentation may be the impetus for the Band to enter into the Agreement with EnviroSolutions.

### (3) Harm Caused

Chivers's representation resulted in the Band's investment of over $750,000, re-

flecting payments made toward its investment in EnviroSolutions from March 29, 1994 through December 8, 1994. This debt was liquidated to judgment in the District Court Action for $625,000, thus establishing the harm caused by Chivers' fraudulent misrepresentations.

### (4) Justifiable Reliance

 The final element for consideration is reliance. In order to satisfy § 523(a)(2)(A), a party need only have justifiably relied on the misrepresentation. *Field,* 516 U.S. at 70, 116 S.Ct. 437; *see also* RESTATEMENT (SECOND) OF TORTS § 525 (1976). In contrast to the now obsolete reasonable reliance standard, justifiable reliance does not require that the creditor prove that he acted consistent with ordinary prudence and care. *Sanford Inst. for Savings v. Gallo,* 156 F.3d 71, 74 (1st Cir.1998)(citing PROSSER & KEATON ON TORTS § 108, at 750–52 (5th ed.1984)). Stated another way, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct in all cases." *Field,* 516 U.S. at 70, 116 S.Ct. 437(citing RESTATEMENT (SECOND) OF TORTS § 545A, cmt. b (1976)). A party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation. *See* RESTATEMENT (SECOND) OF TORTS §§ 540, 541 cmt. a (1976). This rule applies whether the investigation would have been costly and required extensive effort or could have been made without "[a]ny considerable trouble or expense." RESTATEMENT (SECOND) OF TORTS § 540 cmt. a (1976).

Chivers concedes that the Band relied on the fraudulent misrepresentation. However, he argues that the Band's reliance was not justifiable in light of subsequent representations that were made over time. At the hearing, Chivers conceded that the Band may have justifiably relied on the fraudulent misrepresentation in making the initial payment of $100,000 on March 29, 1994. Nevertheless, Chivers relies on the April 11, 1994, "10 Year Projection" for the "Tooele M.S.W. Reduction & Recycling Facility," to evidence that as of that date, the Band knew or should have known that the Recycling Facility was indebted beyond $750,000. The 10 Year Projection includes debt service of $466,000 per year from year one through year ten. Chivers argues that the Band could not have justifiably relied upon Chivers' representation that LE & B would use the Band's invested funds to pay off all of the obligations on the Recycling Facility when the ten year projections showed substantial continued debt service. Therefore, he asserts that any debt incurred after April 11, 1994, is dischargeable.

Despite confusion over the amount of the Recycling Facility's indebtedness, it is undisputed that the Recycling Facility was nearly complete and all construction debt incurred prior to March, 1994. Those debts were reflected in the May 31, 1994, List of Debts, providing a "Total Project Debt" of $1,396,399. Of that amount, $757,907 was attributed to EnviroSolutions as "Total Direct Debt," and the remaining $638,492 was attributed to "LE & B Construction Costs." A breakdown of these figures supports the Band's argument that its reliance on Chivers' representation was justifiable. First, the direct debt set forth in the May 31, 1994, List of Debts appears to reflect indebtedness to both construction vendors and lienholders on the property. Second, the total direct debt attributable to EnviroSolutions is an amount substantially similar to the $750,000 the Band agreed to invest in EnviroSolutions pursuant to the Agreement. Third, Chivers testified during his October 29, 2001,

deposition that EnviroSolutions would assume the liabilities of LE & B and that LE & B invested nearly $800,000 to receive a 50% interest in EnviroSolutions. In the context of this case, LE & B's alleged capital investment of $800,000 is similar to the $638,492 in additional construction costs incurred by LE & B.

 With respect to the April 11, 1994, 10 Year Projection, the conflicting debt servicing set forth therein is insufficient to defeat a justifiable reliance standard. Even were this Court to agree with Chivers that the projection relates solely to the Recycling Facility and, therefore, the Band should have known that additional debt servicing existed, the projection is but one piece of evidence and, even considered in the light most favorable to Chivers, is not sufficient to raise a genuine issue of material fact. The deposition testimony, the visits to the Memphis, Tennessee facility and the Recycling Facility, the National Ecology Precommercial Services Agreement and the Tooele County tipping fee agreement, the terms of the Agreement, the May 31, 1994, List of Debts, all indicate that the Band has proven that its reliance upon Chivers' representation that the Recycle Facility would be transferred to EnviroSolutions for the Band's $750,000 investment was justifiable.[8]

The Band has met all the elements of § 523(a)(2)(A) as a matter of law and based upon facts for which there is no material issue of dispute. Therefore, the motion for summary judgment filed by the Band is granted on its § 523(a)(2)(A)

claim. Chivers' cross motion for summary judgment is denied as it relates to the Band's § 523(a)(2)(A) claim.

### b. Written Representations Under § 523(a)(2)(A)

 As set forth above, this Court has ruled that the Letter does not constitute a statement of financial condition for the purposes of § 523(a)(2)(B), and that the Band has proven its claim under § 523(a)(2)(A) based upon Chivers' oral statements. However, in order to resolve any potential issues that may remain between the parties, it is judicious to determine whether the Letter is actionable under § 523(a)(2)(A).

Prior to the Supreme Court's ruling in *Field v. Mans*, it was well settled that a representation under § 523(a)(2)(A) can be a written representation, other than a statement respecting the insider's financial condition. *Frankford Bank v. Chryst (In re Chryst)*, 177 B.R. 486, 493 (Bankr. E.D.Pa.1994). Although this statement of law remains true following the *Field* decision, the Supreme Court's reliance on the Restatement prompts an examination of the types of written statements actionable under Restatement § 525. Comment "a" to Restatement § 525 references Restatement §§ 531 through 536 in reviewing "the requirement that the representation must be made for the purpose of inducing that conduct of the other from which his harm results." RESTATEMENT (SECOND) OF TORTS § 525, cmt. a (1976).[9] Section 532 of the

---

8. Chivers' argument that the Band must reprove all of the elements of § 523(a)(2)(A) each time it made a contractual payment is rejected. Once the Band is contractually obligated to perform, it is not required to perform new due diligence to ascertain if Chivers' representations are true, even if subsequent events may cast doubt on the wisdom of its prior contractual commitments. Once the

Band reasonably relied upon Chivers' fraudulent misrepresentation in entering into the Agreement, any liability that Chivers incurred arising from his fraud is nondischargeable. *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 140 L.Ed.2d 341 (all liability arising from fraud is nondischargeable.)

9. Comment "a" to Restatement § 525 references Restatement § 532 for the purpose of

Restatement addresses a misrepresentation incorporated in a document or other thing and states:

> One who embodies a fraudulent misrepresentation in an article of commerce, a muniment of title, a negotiable instrument or a similar commercial document, is subject to liability for pecuniary loss caused to another who deals with him or with a third person regarding the article or document in justifiable reliance upon the truth of the representation.

RESTATEMENT (SECOND) OF TORTS § 532 (1976); *Moen,* 238 B.R. at 793.

The definition set forth above, however, is not without its qualifications. The misrepresentations considered here are those "incorporated in a document of a character that makes it expected to be transmitted and to be relied on by third persons in commercial dealings with it, on the faith of the honesty of what it conveys." RESTATEMENT (SECOND) OF TORTS, cmt. c (1976). Comment "c" to Restatement § 532 provides further instruction by stating, in part:

> The rule stated is therefore limited to those documents or chattels that are in themselves articles of commerce. It does not apply to an ordinary letter misrepresenting the title to land or to a report furnished by an accountant to a corporation concerning its finances, be-

cause these documents are not to be expected to have commercial circulation. RESTATEMENT (SECOND) OF TORTS § 532, cmt. c (1976).

In the Letter, Chivers' represented to Quintana and the Band's Executive Committee that LE & B had obtained a line of credit for the Recycling Facility in the amount of $4,500,000.[10] While it is undisputed that this representation is false, it is not actionable as defined by the Restatement. It is a representation made in a letter that was not intended to have commercial circulation, unlike stock certificates, false recitals in deeds or bonds, or containers with misleading labels. *See* RESTATEMENT (SECOND) OF TORTS § 532, cmt. c (1976). Nor is the Letter actionable as an amendment to an article of commerce inasmuch as there is no evidence that Chivers had previously presented the Band with any commercially acceptable document related to the Band's investment. *Cf. e.g. Sempione v. Provident Bank,* 75 F.3d 951, 962–63 (4th Cir.1996)(citing Restatement § 532 and opining that a cause of action for fraudulent misrepresentations made in a letter may be maintained if interpreted as amending a Letter of Credit). Although representations were made in the Letter concerning commercial lending, the Letter was merely a written communication between Chivers and the Band inviting further action.[11] Based on the

---

determining the element of inducement. Although a complete analysis under Restatement § 525 requires the examination of fraudulent misrepresentation, harm, and justifiable reliance, the starting point is an analysis of the Letter using the narrow definition of Restatement § 532. Based on the nature of the Letter, analysis of the remaining elements will not be required.

10. The Band argues that the misrepresentation in the Letter that $2,000,000 was expended on the "facility" is also an actionable statement because it must relate to the Recycling Facility: the only facility under construction.

Although it is undisputed that the representation was made and that it was false, the parties' briefs, as well as their oral arguments, present conflicting statements of fact concerning to which "facility" that expenditure relates. Nevertheless, the statement is not one upon which this Court must rely in rendering a decision, nor does it raise a genuine issue of material fact precluding summary judgment.

11. Moreover, the "current summary of the project financials" attached to the Letter does not transmute the Letter into an article of commerce as contemplated under Restate-

foregoing, this Court need not consider the remaining elements of Restatement § 525.[12]

Judgment shall issue accordingly.

ment § 532. *See* RESTATEMENT (SECOND) OF TORTS § 532, cmt. c (1976). Not only is the subject line of the Letter titled "Tooele Tissue Mill Funding," but the attached financials concern a "60 Ton Mill," not the Recycling Facility in which the Band would eventually invest.

**12.** *See supra,* note 9.