**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

In re:

JEANNE LAVONNE JOELSON,

     Debtor.

_____

STANLEY CADWELL,

     Plaintiff - Appellee,

v.

JEANNE LAVONNE JOELSON,

     Defendant - Appellant.

No. 04-8052

_____

**Appeal from the United States Bankruptcy Appellate Panel
of the Tenth Circuit
(No. WY-03-020)**[*]

_____

Ken McCartney, Cheyenne, Wyoming, for Defendant-Appellant.

Lawrence E. Middaugh, Casper, Wyoming, for Plaintiff-Appellee.

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Before **EBEL**, **O'BRIEN** and **TYMKOVICH**, Circuit Judges.

**EBEL**, Circuit Judge.

This appeal requires us to determine whether a state court judgment against Defendant-Appellant Jeanne Joelson ("Debtor" or "Joelson") based on Joelson's nonpayment of a loan from Plaintiff-Appellee Stanley Cadwell ("Creditor" or "Cadwell") should not be discharged in Joelson's Chapter 7 bankruptcy because Joelson made fraudulent misrepresentations to Cadwell in order to obtain the loan. Relying on 11 U.S.C. § 523(a)(2)(A), the United States Bankruptcy Court for the District of Wyoming ("bankruptcy court") and the Bankruptcy Appellate Panel of the Tenth Circuit ("BAP") found that the state court judgment should not be discharged. In this appeal, Joelson argues that the BAP erred because the representations that she made to Cadwell were statements "respecting [her] financial condition" as defined by § 523(a)(2)(A), and debts incurred based on such statements are dischargeable under § 523(a)(2)(A) notwithstanding that provision's general prohibition on discharging debts obtained by "false pretenses, a false representation, or actual fraud." We affirm the judgment of the BAP.

# BACKGROUND

## I.    The Underlying Events

Joelson has never contested the bankruptcy court's factual findings.
Moreover, Joelson's appendix contains only the bankruptcy court's docket sheet,
order and judgment, and the BAP's docket sheet and opinion.  Thus we may not
disturb the bankruptcy court's factual findings in this case, and we draw the
following description of the events underlying this suit from those findings.  See
Jenkins v. Hodes (In re Hodes), 287 B.R. 561, 570 (D. Kan. 2002) ("[B]ecause
the parties do not specifically contest the bankruptcy court's findings of fact, the
court will not disturb this ruling on appeal."), aff'd, 402 F.3d 1005 (10th Cir.
2005); cf. McEwen v. City of Norman, 962 F.2d 1539, 1550 (10th Cir. 1991)
(noting that we are unable to review an appellant's factual contention when the
evidentiary matters relied on by a lower court are not included in the record on
appeal).

Cadwell is a single, retired man who lives in Casper, Wyoming.   Cadwell
met Joelson at a café in Casper where she was working as a waitress.  Around
March 1996, Joelson told Cadwell that she needed to travel to Scottsdale, Arizona
to check on a house that she owned and pick up her mother.

Cadwell agreed to drive Joelson from Casper to Scottsdale.  While Cadwell
and Joelson were in Scottsdale, someone gave Joelson money.   Joelson

represented to Cadwell that the money was rent for the house that she owned in Scottsdale.

After Cadwell and Joelson returned to Casper, Joelson informed Cadwell that she needed a loan of over $50,000 to save her Scottsdale home from foreclosure. Joelson stated that her brother, Larry Oltman, would later loan her these funds, and that as soon as Oltman did so, she would repay Cadwell. Joelson promised that she would provide Cadwell with collateral to secure the loan and represented that she owned residences in both Casper and Glendo, Wyoming; a motel in Glendo; and a number of antique vehicles stored in Glendo. When Cadwell asked to see the properties, Joelson took Cadwell to Glendo and showed Cadwell the inside of a house, the outside of another house and a motel, and a storage facility in which the antique cars were allegedly housed. Joelson also provided Cadwell with a list of the antique cars that she allegedly owned.

After he viewed the properties, Cadwell mortgaged his home and borrowed over $50,000. Joelson gave Cadwell a promissory note,[1] and the two traveled to

_____

[1]The promissory note is not part of the record, and there is no indication in the opinions of the bankruptcy court or the BAP as to the note's contents. Thus, it is not clear whether all of the properties and the antique cars that Joelson said she owned were intended as collateral. However, we need not determine what Joelson listed as collateral in the note in order to resolve this appeal. This is because we only need consider the fact that Joelson made representations as to her ownership of various properties and vehicles in order to obtain a loan from Cadwell.

- 4 -

Arizona, where they met with a lender's representatives regarding the foreclosure. In the course of these dealings, Cadwell learned that the Arizona property was titled in the name of "Joelene M. Joelson." However, Cadwell knew Debtor as "Jeanne Joelson," not "Joelene M. Joelson." After Debtor told Cadwell that she and "Joelene M. Joelson" were the same person, Cadwell advanced approximately $54,000 to Joelson to pay off the Deed of Trust.

Cadwell's attempts to collect the loan have proved fruitless, as Joelson has not repaid the loan or forfeited collateral. Joelson has rebuffed Cadwell's claims by asserting that she never had an interest in the Scottsdale property and that the funds that Cadwell gave to her in connection with that property were a gift.

## II.    The Proceedings Below

Before bringing this suit, Cadwell brought suit in Wyoming state court on the promissory note that Joelson had given to him. The state court entered judgment ("the state court judgment") against Joelson. After Joelson filed for Chapter 7 bankruptcy, Cadwell filed an adversary proceeding in the bankruptcy court seeking to bar all of Joelson's debts—or, in the alternative, just the state court judgment—from being discharged.

Joelson failed to appear before the bankruptcy court. Nonetheless, Joelson's counsel presented Joelson's case to the court, and both parties presented closing arguments. The bankruptcy court refused to deny the discharge of all

claims against Joelson, but the court relied on § 523(a)(2)(A) to hold that Cadwell's claim was not dischargeable.

In making this ruling, the bankruptcy court was unable to conclude whether Jolene Joelson, Joelene Joelson, and Jeanne Joelson are three names for Debtor, or two (or three) separate people. However, the court did determine that Joelson's assertion that she owned "residences in both Casper and Glendo, a motel in Glendo, and a number of antique vehicles stored in Glendo" was false.

On appeal, the BAP affirmed the bankruptcy court's decision. The BAP ruled that some of the misrepresentations that Joelson made to Cadwell were not statements "respecting [her] financial condition." As a result, the BAP ruled that under § 523(a)(2)(A) those misrepresentations, which induced Cadwell to loan money to Joelson, prevented the state court judgment from being discharged.

This appeal from Joelson followed.

## DISCUSSION

### I.    Overview

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 158. See 28 U.S.C. § 158(d). "When reviewing BAP decisions, we independently review the bankruptcy court decision." In re Myers, 362 F.3d 667, 670 (10th Cir. 2004). We review the bankruptcy court's legal determinations de novo. See Panalis v. Moore (In re Moore), 357 F.3d 1125, 1127 (10th Cir. 2004).

In general, after an individual debtor files for Chapter 7 bankruptcy, a court discharges all of the debtor's pre-existing obligations. See 11 U.S.C. § 727. However, some debts incurred as a result of the debtor's fraudulent actions or statements cannot be discharged in bankruptcy. See id. § 523(a)(2). The Bankruptcy Code sets out the types of fraudulent actions or statements that render debts incurred as a result of those statements either non-dischargeable or dischargeable. See id.

Specifically, 11 U.S.C. § 523(a)(2)(A) states that a debt obtained by "false pretenses, a false representation, or actual fraud" is not dischargeable. However, § 523(a)(2)(A) contains an exception: If a debt is obtained by a false oral "statement respecting the debtor's . . . financial condition," the debt is dischargeable. By contrast, 11 U.S.C. § 523(a)(2)(B) states that a debt obtained by a false written statement "respecting the debtor's . . . financial condition" is not dischargeable, provided certain conditions are met.

Because the phrase "respecting the debtor's . . . financial condition" is used in both § 523(a)(2)(A) and § 523(a)(2)(B) and both provisions were enacted as part of the same statute, see Pub. L. No. 95-598, Nov. 6, 1978, 92 Stat. 2590, this is "a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." Sullivan v. Stroop, 496 U.S. 478, 484 (1990) (quotations

omitted).  However, because § 523(a)(2)(A) provides that a debt obtained by a false oral statement "respecting the debtor's . . . financial condition" is dischargeable, and § 523(a)(2)(B) provides that a debt obtained by a false written version of such a statement is not dischargeable, any interpretation of the phrase "respecting the debtor's . . . financial condition" will have opposing effects depending on whether the statement was oral or written.  If the phrase is broadly construed so that more false oral statements qualify as "respecting the debtor's . . . financial condition," more debts will be dischargeable under § 523(a)(2)(A) because that provision allows debts obtained by oral versions of such statements to be discharged—even though debts obtained by other false pretenses, false representations, or actual fraud may not be discharged.  By contrast, a broad construction of the phrase "respecting the debtor's . . . financial condition," will result in fewer debts obtained based on written versions of such statements to be dischargeable under § 523(a)(2)(B) because that provision bars the discharge of only those false statements that "respect[] the debtor's . . . financial condition."

The opposing nature of § 523(a)(2)(A) and (B) is visible from the text of the statute, which provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
> . . . .
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

- 8 -

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(A)-(B).

The phrase "respecting the debtor's . . . financial condition" has a range of potential meanings. Under what many of the courts who have considered this issue refer to as the "broad interpretation," a statement "respecting the debtor's . . . financial condition" is any communication that has a bearing on the debtor's financial position. Skull Valley Band of Goshute Indians v. Chivers (In re Chivers), 275 B.R. 606, 614 (Bankr. D. Utah 2002). Thus, the broad interpretation posits that a communication addressing the status of a single asset or liability qualifies as "respecting the debtor's . . . financial condition." See id.

Under what courts refer to as the "strict interpretation," a statement "respecting the debtor's . . . financial condition" is any communication that presents an overall picture of the debtor's financial position. Id. at 615. This interpretation limits statements "respecting the debtor's . . . financial condition"

to communications that purport to state the debtor's overall net worth, overall financial health, or equation of assets and liabilities.  See id.

In this case, because most of the pre-loan communications between Joelson and Cadwell were oral, the parties focus on § 523(a)(2)(A), which addresses false oral communications.[2]  Joelson argues that the phrase "respecting the debtor's . . . financial condition" should be interpreted broadly to include all oral communications that reflect on the extent of any of her assets, liabilities, and income.  Joelson takes this position because under § 523(a)(2)(A), although debts obtained by "false pretenses, a false representation, or actual fraud" are not dischargeable, debts obtained by false statements "respecting the debtor's . . . financial condition" are dischargeable.  Thus, it is in Joelson's interest for her communications to Cadwell to qualify as "respecting [her] financial condition," so that the state court judgment can be discharged.  As is discussed below, Joelson's communications with Cadwell did contain some information as to her assets and income, so the state court judgment would be dischargeable under the broad interpretation she urges.

_____

[2]Because neither the parties nor the courts below address whether the list of antique vehicles that Joelson provided to Cadwell renders the state court judgment nondischargeable under § 523(a)(2)(B), we need not and do not consider the issue.  See Singleton v. Wulff, 428 U.S. 106, 120 (1976); Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc., 100 F.3d 792, 798-99 (10th Cir.), op. amended on other grounds, 103 F.3d 80 (10th Cir. 1996).

- 10 -

On the other hand, Cadwell argues that the phrase "respecting the debtor's . . . financial condition" should be interpreted strictly to include only information as to Joelson's overall financial health, not information as to her individual assets or liabilities. As is discussed below, none of Joelson's communications with Cadwell contain information on Joelson's overall net worth, overall financial condition, or overall ability to generate income. Thus, if the phrase "respecting the debtor's . . . financial condition" is interpreted strictly, the state court judgment would not be dischargeable under § 523(a)(2)(A) because Joelson would have obtained a loan by "false pretenses, a false representation, or actual fraud"—not a false statement "respecting [her] financial condition." This would prevent Cadwell from having to settle for his claim against Joelson being resolved at a discount in bankruptcy court.

Therefore, our legal interpretation of the scope of the phrase "respecting the debtor's . . . financial condition" will determine the outcome of this case. For the reasons discussed below, we believe that the strict interpretation of the phrase is most consistent with the text and structure of the Bankruptcy Code, Congress's intent as expressed in the legislative history of 11 U.S.C. § 523(a)(2)(A) and (B), and case law.

## II.     Legal Analysis

### A.      Text, Structure and Policy of the Bankruptcy Code

The Bankruptcy Code does not offer a definition of the phrase "respecting the debtor's . . . financial condition." Nor does the Code even offer a definition of the term "financial condition." However, the Code's definition of the term "insolvent" provides tangential support for the proposition that the phrase "respecting the debtor's . . . financial condition" should be construed as relating only to information on the debtor's overall financial condition.

The Code defines "insolvent" as, inter alia, the "*financial condition* such that the sum of [an] entity's debts is greater than all of such entity's property . . . exclusive of [certain types] of property." 11 U.S.C. § 101(32)(A) (emphasis added); see also id. § 101(32)(C) (defining a municipality's insolvency as the "*financial condition* such that the municipality is (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due") (emphasis added). The Code's use of the term "financial condition" in these definitions to refer to the difference between an entity's overall property and debts—the entity's net worth—in defining the word "insolvent" suggests that the term "financial condition" in § 523(a)(2)(A) and (B) also relates to a debtor's net worth or overall financial condition. This conclusion is buttressed by the fact that the Code uses the term

- 12 -

"financial condition" to refer to an overall flow of funds—a cash flow—in defining when a municipality is insolvent.

Perhaps more importantly, as noted above, the text and structure of § 523(a)(2)(A) and (B) reveal that any interpretation of the phrase "respecting the debtor's . . . financial condition" will have opposing impacts on debtors and creditors under each of the sections. A strict reading fits better within the overall structure of the statute. The statute treats oral and written statements "respecting the debtor's . . . financial condition" very differently. If a debtor's oral statements "respecting [his or her] financial condition" later turn out to be false, debts obtained based on such statements can still be discharged under § 523(a)(2)(A). However, other fraudulent oral communications still bar from discharge debts obtained based on such communications under that provision, and under § 523(a)(2)(B) written statements "respecting the debtor's . . . financial condition" bar debts obtained based on them from discharge.

In oral communication, it is far more difficult to portray accurately one's overall financial position than to represent the condition of one particular asset or liability. After all, such communication is often informal and spontaneous, and one might simply forget a particular asset or liability when listing all of one's assets and liabilities. However, when asked to describe a particular asset or liability, one has had a particular subject called specifically to mind. Therefore, it

is logical to give more leeway (and more dischargeability) to a debtor who errs in stating his or her overall position orally, since it is more likely that he or she may have made a mistake inadvertently. It is also logical to give less leeway to a debtor who makes a specific oral misrepresentation as to a particular asset, because it is less likely that such a misrepresentation is inadvertent. By the same token, it is logical to give little leeway (and less dischargeability) under § 523(a)(2)(B) to a debtor who fraudulently misstates his or her overall financial position in writing, since such communications carry an air of formality that their oral counterparts do not and are typically made after more studied consideration.

Thus, a strict interpretation of the phrase "respecting the debtor's . . . financial condition" to limit such representations to statements going to a debtor's overall financial net worth or financial condition is in keeping with the text and structure of § 523(a)(2)(A) and (B).

**B.    Legislative History of § 523(a)(2)(A) and (B)**

The legislative history of § 523(a)(2)(A) and (B) corroborates the view that the strict definition of "respecting the debtor's . . . financial condition" is most in keeping with Congress's intent in promulgating these provisions.[3]

---

[3]We may examine this legislative history because this is not a case where the meaning of the Bankruptcy Code is clear from the statute's text. Cf. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240-41 (1989).

### 1.    Roots of § 523(a)(2)(A) and (B)

Section 523(a)(2)(A) has its roots in the Bankruptcy Act of 1898, 30 Stat. 544. When the predecessor to § 523(a)(2)(A) was included in the Bankruptcy Code in 1898 and amended in 1903, it barred the discharge of debts arising from false pretenses or false representations. See Bankruptcy Act of 1898, 30 Stat. 544, 550-51, § 17(a)(2); Act of Feb. 5, 1903, ch. 487, 32 Stat. 797, 798, § 17(a)(2). In contrast to present-day § 523(a)(2)(A), neither the 1898 nor the 1903 provision allowed the discharge of debts obtained by false oral statements "respecting the debtor's . . . financial condition." See id. This approach remained substantially unchanged until 1978, when the 1903 provision was reworded and recodified as § 523(a)(2)(A).

Congress inserted the predecessor of § 523(a)(2)(B) into the Bankruptcy Act of 1898 in 1903. See Act of Feb. 5, 1903, ch. 487, 32 Stat. 797, 797-98, § 4. The predecessor to § 523(a)(2)(B) was a separate provision that provided grounds for a court to deny the discharge of all of a debtor's obligations, not merely to deny the discharge of a particular debt obtained through the use of a materially false statement in writing. See id. at § 4(b)(3) ("The judge shall . . . discharge the applicant unless he has . . . obtained property on credit from any person upon a materially false statement in writing . . . ."). Therefore, as of 1903, if a debtor had obtained property on credit through the use of an oral misrepresentation, that

particular debt would be excepted from discharge; if a debtor had obtained property on credit through the use of a written misrepresentation, none of the debtor's debts could be discharged.

### 2.    1960 Amendments

By 1960 it had become clear to Congress that the predecessor to § 523(a)(2)(B) was having undesirable effects: imposing severe penalties on noncommercial bankrupts, opening the way to abuse by some creditors, and yielding windfalls for other creditors.  See S. Rep. No. 1688, at 2-3 (1960), reprinted in 1960 U.S.C.C.A.N. 2954, 2955.  Congress was particularly concerned with the abusive practices of certain commercial creditors who "frequently condoned, or even encouraged, [would-be debtors'] issuance of statements omitting debts with the deliberate intention of obtaining a false agreement for use in the event that the borrower subsequently goes into bankruptcy." Id. (quoting H.R. Rep. No. 1111, at 2-3 (1959)) (quotations in original omitted), reprinted in 1960 U.S.C.C.A.N. 2954, 2955.  "[A]rmed with a false financial statement," these creditors had "a powerful weapon with which to intimidate a debtor into entering an agreement in which the creditor agree[d] not to oppose the discharge in return for the debtor's agreement to pay the debt in full after discharge."  Id. (quotations in original omitted).

Based on these concerns, Congress recrafted the predecessor to § 523(a)(2)(B) so that false written financial statements made by individuals no longer barred the discharge of all of an individual debtor's obligations. See Act of July 12, 1960, Pub. L. No. 86-621, 74 Stat. 408, 409, § 2. Instead, the statutory language addressing such written statements was combined with the precursor of § 523(a)(2)(A) so that only the specific debt incurred as a result of the false written financial statement was not dischargeable. See id. Under the 1960 amendment the language of the newly-combined predecessor provision to § 523(a)(2)(A) and (B) did not explicitly allow the discharge of debts incurred based on oral misrepresentations going to financial condition. See id.

However, the legislative history's repeated references to false "financial statement[s]," S. Rep. No. 1688, at 2-3 (1960) (using the term "financial statement" seven times) (quotations in original omitted), reprinted in 1960 U.S.C.C.A.N. 2954, 2955, lends support to a strict interpretation of that phrase restricting it to statements pertaining to the overall financial condition of the debtor—and, by extension, to a similarly strict interpretation of the similar phrase "respecting the debtor's . . . financial condition" in § 523(a)(2)(A) and (B). The term "financial statement" has a strict, established meaning, suggesting that the phrase "statement respecting [the bankrupt's] financial condition" for which it is so freely substituted should be given the same meaning. See Black's Law

Dictionary (8th ed. 2004) (defining "financial statement" as "[a] balance sheet, income statement, or annual report that summarizes an individual's or organization's financial condition on a specified date or for a specified period by reporting assets and liabilities" or an "income-and-expense declaration"). Moreover, the legislative history's reference to businesses' use of financial statements to establish credit standing also lends support to the strict interpretation of the phrase "statement respecting [the bankrupt's] financial condition," for it is communications as to a person's overall financial condition that are typically used to establish such standing. See S. Rep. No. 1688, at 2-3 (1960), reprinted in 1960 U.S.C.C.A.N. 2954, 2955.

### 3. 1978 Recodification

In 1978, Congress gave the provisions at issue in this case much of their current wording and recodified them as § 523(a)(2)(A) and (B). See Pub. L. No. 95-598, Nov. 6, 1978, 92 Stat. 2590. The House Committee on the Judiciary noted that the bill that formed the backbone of § 523(a)(2)(A) and (B) was "modified only slightly" from its predecessor, and none of the modifications noted by the Committee impact the meaning of "respecting the debtor's . . . financial condition." H. Rep. No. 95-595, at 364, reprinted in 1978 U.S.C.C.A.N. 5963, 6320; see also S. Rep. No. 95-989, at 78, reprinted in 1978 U.S.C.C.A.N. 5787, 5864. Indeed, Don Edwards, a member of the House Committee on the

Judiciary, introduced the amendment that embodied the compromises worked out by the Conference Committee—the final amendment to the bill before its passage—by stating that § 523(a)(2)(A) "is intended to codify current case law." Statement by the Hon. Don Edwards, Sept. 28, 1978, 124 Cong. Rec. H. 11089, reprinted in 1978 U.S.C.C.A.N. 6436, 6453; see also Statement by the Hon. Dennis DeConcini, Oct. 6, 1978, 124 Cong. Rec. S. 17406, reprinted in 1978 U.S.C.C.A.N. 6505, 6522 (introducing the House amendment to the Senate).

Thus, there is no indication in the legislative history that Congress's 1978 decision to allow debts obtained by false oral statements "respecting the debtor's . . . financial condition" to be dischargeable under § 523(a)(2)(A) was intended to work a substantive change in the law. That is, there is no indication in the legislative history that Congress intended to remove from the coverage of § 523(a)(2)(A) any of the debts based on oral misrepresentations going to financial condition that had been within the coverage of that provision's predecessors.

Thus, the legislative history of § 523(a)(2)(A) and (B) supports the strict reading of the phrase "respecting the debtor's . . . financial condition." There simply is no indication in the legislative history that Congress wished to exclude a large class of specific oral misrepresentations from the coverage of § 523(a)(2)(A). Indeed, it appears that § 523(a)(2)(B) and its predecessors were

designed to provide an additional remedy for violations premised on the use of a fraudulent writing, not undermine the coverage of § 523(a)(2)(A) and its predecessors.

**C.    Courts' Treatment of § 523(a)(2)(A) and (B)**

Cases interpreting the phrase "respecting the debtor's . . . financial condition" have split on this issue. See <u>Schneiderman v. Bogdanovich (In re Bogdanovich)</u>, 292 F.3d 104, 112-13 (2d Cir. 2002) (collecting cases). However, we find the cases adopting the strict definition to be more persuasive.

**1.    Supreme Court**

In <u>Field v. Mans</u>, 516 U.S. 59 (1995), the court held that debts extended based on a debtor's oral fraudulent statements may be barred from being discharged under § 523(a)(2)(A) if a creditor "justifiably" relied on those statements, while debts extended based on a debtor's written financial statements may only be barred from being discharged under § 523(a)(2)(B) if a creditor "reasonably" relied on those statements. Although that decision did not address the issue directly, it lends some support to the notion that a statement "respecting the debtor's . . . financial condition" must relate to a debtor's overall financial health. In discussing § 523(a)(2)(A) and (B), the Court freely substituted the phrases "statement of financial condition" and "financial statement" for the phrase "statement respecting the debtor's . . . financial condition." "Statement of

financial condition" and "financial statement" are terms with established meanings that involve an individual or entity's overall financial health. See Black's Law Dictionary (8th ed. 2004) (defining "statement of condition" with a cross-reference to "balance sheet"—"[a] statement of an entity's current financial position, disclosing the value of the entity's assets, liabilities, and owners' equity"—and defining "financial statement" as "[a] balance sheet, income statement, or annual report that summarizes an individual's or organization's financial condition on a specified date or for a specified period by reporting assets and liabilities" or an "income-and-expense declaration"). Thus, the Court's substitution of these established phrases for the more unusual "statement respecting the debtor's . . . financial condition" implies that this unusual phrase should be given a meaning similar to that of the established phrases—not an expansive meaning that might embrace statements respecting only a single aspect of the debtor's financial condition.

Moreover, if the phrase "respecting the debtor's . . . financial condition" were given a broad reading, the resulting exclusion might eliminate coverage for many misrepresentations typical of the common-law torts that Field represents as lying at the heart of § 523(a)(2)(A). See 516 U.S. at 68-69 (noting that "the substantive terms in [§] 523(a)(2)(A) . . . refer to common-law torts" and stating that "[t]he operative terms in § 523(a)(2)(A) . . . 'false pretenses, a false

- 21 -

representation, or actual fraud' carry the acquired meaning of terms of art").

Under the broad interpretation, debts incurred as a result of many of the fraudulent statements cited in the Restatement (Second) of Torts, see Field, 516 U.S. at 70, could not be excepted from discharge under § 523(a)(2)(A), since the fraudulent statements would qualify as "respecting the debtor's . . . financial condition" and therefore would be dischargeable. See, e.g., Restatement (Second) of Torts (1976), § 525, illus. 3 (describing a seller's statement that stock shares will pay dividends within five years); id., § 529, illus. 2 (describing a seller's statement that apartments in a building are rented to tenants at a particular rate, but neglecting to mention that the rate has not been approved by rent control authorities, as a fraudulent misrepresentation); id., § 540, illus. 1 (treating a seller's statement to a potential buyer that land is free from encumbrances as a fraudulent misrepresentation of fact).

###          2.        Tenth Circuit

The Tenth Circuit has not directly addressed the question of how to interpret the phrase "respecting the debtor's . . . financial condition." In Bellco First Federal Credit Union v. Kaspar (In re Kaspar), 125 F.3d 1358 (10th Cir. 1997), we quoted a passage from a Fourth Circuit case that appeared to adopt a broad interpretation of the phrase "respecting the debtor's . . . financial condition":

> "Congress did not speak in terms of financial statements. Instead it referred to a much broader class of statements—those 'respecting the debtor's . . . financial condition.' A debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition. Indeed, whether his assets are encumbered may be the most significant information about his financial condition. Consequently, the statement must be in writing to bar the debtor's discharge."

Id. at 1361 (quoting Engler v. Van Steinburg (In re Van Steinburg), 744 F.2d 1060, 1061 (4th Cir. 1984)). However, while the Fourth Circuit decision quoted by Kaspar turned on whether a statement that an asset was not encumbered was a statement "respecting [a] debtor's . . . financial condition," Kaspar cited the Fourth Circuit case only as part of its analysis that a statement must be in writing, and about a debtor's financial condition, for a debt incurred as a result of that statement to be nondischargeable under § 523(a)(2)(B). See id. at 1360-61. Kaspar's discussion of the quoted passage was limited to the statement that "[a]s noted in Engler, giving a statement of financial condition is a solemn part of significant credit transactions." Id. at 1361.

In any event, the debtors' statements in Kaspar likely would have qualified as "respecting the debtor[s'] . . . financial condition" even under the strict definition of that phrase. The oral representations made by the debtors in Kaspar included representations as to the debtors' "financial condition, the name of [their] employer[s], [their] title[s], and salar[ies]. . . . the names of other creditors, the balances due on obligations owed those creditors as well as the

monthly payments on the debts." Id. at 1359. Thus, while Engler indicates that a

debtor's statement that an asset is unencumbered is enough to qualify as

"respecting the debtor's . . . financial condition," Kaspar does not go so far.

Rather, Kaspar addresses only two debtors' statements that, because they

contained general information about the debtors' overall financial health, would

have qualified under the strict definition of the phrase "respecting the debtor's . .

. financial condition."

For these reasons, we view the question of how to interpret "respecting the

debtor's . . . financial condition" as an open issue in this circuit.

### 3.    Other Courts

The trend and reasoning in other courts' decisions interpreting the phrase

"respecting the debtor's . . . financial condition" offer persuasive support for a

strict reading of the phrase. Chivers, 275 B.R. at 606, succinctly summarizes the

trend in these courts' efforts:

> The emerging viewpoint follows a strict interpretation.
> Although it does not require any specific formality, the strict
> interpretation limits an actionable statement of financial condition to
> financial-type statements including balance sheets, income
> statements, statements of changes in financial position, or income
> and debt statements that provide what may be described as the debtor
> or insider's net worth, overall financial health, or equation of assets
> and liabilities. Cases supporting this view generally recite four
> arguments. First, they argue that the normal commercial meaning and
> usage of "'statement' in connection with 'financial condition'
> denotes either a representation of a person's [an entity's] overall 'net
> worth' or a person's [an entity's] overall ability to generate income."

Second, they cite to legislative history that references the statutes' application to the "'so-called false financial statement.'" Third, they argue that the strict interpretation promotes better bankruptcy policy, because narrowing the definition of financial condition in § 523(a)(2)(B) necessarily expands those statements, both written and oral, that do not relate to financial condition that fall within § 523(a)(2)(A) and better harmonizes the statute. Finally, they argue that a strict interpretation is consistent with the historical basis of § 523(a)(2)(B), which was designed to protect debtors from abusive lending practices.

Id. at 615 (citations and footnotes in original omitted). The Chivers court went on to adopt the emerging, strict interpretation:

[T]he strongest argument in favor of the broad interpretation—that had Congress wanted § 523(a)(2)(B) limited to false financial statements, it would have so drafted the statute—is gutted by the Supreme Court's repeated statements in Field v. Mans that § 523(a)(2)(B) refers to false financial statements. While it might be convenient to dismiss Field's repeated references to false financial statements as dicta, Field's meticulous comparison of §§ 523(a)(2)(A) and (B) does not lend itself to that interpretation. Rather, it makes it more difficult to dismiss as unintentional the recharacterization of "a statement in writing . . . respecting . . . financial condition" as a false financial statement. Lastly, Field's recitation of the history of § 523(a)(2)(B) and its goal of preventing abuse by consumer finance companies, which sometimes have encouraged false financial statements by their borrowers for the purpose of insulating their own claims from discharge, lends strong support for adoption of the strict interpretation.

Therefore, the better approach is the strict interpretation of § 523(a)(2)(B) that requires a false written statement to describe the debtor's net worth, overall financial health, or ability to generate income. It is the most consistent with the Supreme Court's interpretation of the statute, it is consistent with the history of the reason for the creation of the statute, it strictly construes § 523(a)(2)(B) against the creditor and liberally in favor of the debtor, and it . . . reconciles §§ 523(a)(2)(A) and (B) without impairing their effectiveness.

- 25 -

Id. at 615-16.

The Bankruptcy Court for the Southern District of New York has also propounded a Chivers-style justification for the strict approach:

> Under the so-called strict interpretation, [§ 523(a)(2)(B)] is limited to financial-type statements that are sufficient to determine the entity's overall financial responsibility, but no specific formality is required. These typically include balance sheets, income statements, statements of changes in financial position, or income and debt statements in the case of an individual wage earner, that reflect a person's ability to pay an additional debt. By contrast, a statement relating to the financial condition of a single asset does not qualify.
>
> Proponents of the strict view rely on the language used in the code, and point to its legislative history. They give "financial condition" its normal commercial meaning and usage. Further, the floor statements by Representative Edwards and Senator DeConcini, sponsors of the Bankruptcy Reform Act of 1978, indicate that the exception encompassed the use of the "so-called false financial statement." . . .
>
> Finally, the strict view promotes better bankruptcy policy. Virtually any statement concerning an asset or liability arguably relates to financial condition. If drawn too broadly, the definition will sweep in many oral misrepresentations, and therefore exclude them from coverage under subdivision (A). These debtors will thereby escape the anti-discharge provisions completely.
>
> . . . .
>
> The arguments supporting the strict view are more persuasive [than those supporting the broad view]. [The arguments supporting the strict view] are consistent with ordinary usage and faithful to the intent of Congress as reflected in the statements of the sponsors. Moreover, the strict view better reflects the limited purpose that subdivision (B) was intended to serve. Subdivision (B) and its predecessors (dating back to 1903) were designed to protect debtors from abusive lending practices. . . .
>
> Th[ese] practice[s] gave the lender leverage to extract a settlement or reaffirmation, despite a weak case, from a debtor intent on avoiding litigation costs. Section 523(a)(2)(B) (and its

predecessors) . . . were intended to reduce the pressure on the honest debtor to settle. The lender must defend the adequacy of its lending form in the comparatively debtor-friendly bankruptcy court. Under § 523(d), the prevailing debtor may recover costs and attorneys fees from the creditor. Finally, § 523(a)(2)(B) requires proof of reasonable reliance, an objective standard. Hence, the lender's access to other information regarding the debtor's financial condition is relevant.

Admittedly, section 523(a)(2)(B) is not limited to extensions of credit by consumer finance companies or other lenders. It also applies where the debtor obtains goods or services. Nevertheless, it was designed to deal with a specific problem—tricking the debtor into presenting a false picture of his overall financial condition. Certainly, it was not intended to create an exception that swallowed up the general rule in subdivision (A). In this regard, virtually every statement by a debtor that induces the delivery of goods or services on credit relates to his ability to pay. The broad interpretation would permit many dishonest debtors to avoid the consequences of oral fraud. The better rule decides cases on their merits, rather than upon the construction of an ambiguous, statutory phrase that grants a fresh start without regard to the honesty of the debtor.

Weiss v. Alicea (In re Alicea), 230 B.R. 492, 502-04 (Bankr. S.D.N.Y. 1999)

(citations and footnotes in original omitted).

Given the smaller number of circuit court decisions interpreting the phrase "respecting the debtor's . . . financial condition," discerning a trend in the circuit court decisions is difficult. As noted above, the Fourth Circuit appears to have adopted the broad interpretation, though it did so only in a brief 1984 opinion that it has never cited again. See Engler, 744 F.2d at 1061 ("A debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition."). The Eighth Circuit's decision in Rose v. Lauer (In re

- 27 -

Lauer), 371 F.3d 406, 413-14 (8th Cir. 2004) (finding a debt nondischargeable under § 523(a)(2)(A) because the debtors "committed garden variety common law fraud when they induced [the creditors] to sell their limited partner interests by concealing material changes in the [partnership's] asset mix"), provides support for the strict interpretation.[4]

Ultimately, we conclude that the trend cited by Chivers and the reasoning employed by Chivers and Alicea offer persuasive support for the strict reading.

**D.     Summary of Legal Analysis**

For the above reasons, it appears that the strict reading of "respecting the debtor's . . . financial condition" is correct. It is the reading most consistent with the text and structure of the Bankruptcy Code, the legislative history of § 523(a)(2)(A) and (B), and case law. To state generally that we adopt a strict interpretation is not enough to resolve this case or to provide guidance to future courts, however; we must also define precisely the scope of the phrase "respecting the debtor's . . . financial condition."

---

[4]While the issue of how to interpret the phrase arose in two other circuit court cases, those courts did not definitively interpret the scope of the phrase. See Bogdanovich, 292 F.3d at 113-14 (refraining from adopting either the strict or the broad interpretation for justiciability reasons); Berkson v. Gulevsky (In re Gulevsky), 362 F.3d 961, 962-64 (7th Cir. 2004) (declining to address a bankruptcy court finding that "because [the debtor]'s misrepresentations were of his financial condition, and were oral, they were not actionable under any part of § 523(a)(2)").

Title 11, United States Code § 523(a)(2)(A) generally bars the discharge of the debts of an individual debtor to the extent that those debts were obtained by false pretenses, a false representation, or actual fraud. However, to the extent that those debts were obtained by the use of a false oral statement respecting the debtor's or an insider's financial condition, they are dischargeable. We hold that such false statements are those that purport to present a picture of the debtor's overall financial health. Statements that present a picture of a debtor's overall financial health include those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities. However, such statements need not carry the formality of a balance sheet, income statement, statement of changes in financial position, or income and debt statement. What is important is not the formality of the statement, but the information contained within it—information as to the debtor's or insider's overall net worth or overall income flow.

III.   Application

In this case, the findings of the bankruptcy court indicate that Joelson made at least two types of representations. First, Joelson made representations as to her ownership of certain specific assets (the "Ownership Representations"). Second, Joelson made representations as to her intention and specific ability to obtain

financing from her brother to repay Cadwell's loan (the "Repayment Representations").

The Ownership Representations address only Joelson's ownership of certain assets. Thus, the Ownership Representations do not constitute a statement as to Joelson's overall financial health analogous to a balance sheet, income statement, statement of changes in financial position, or income and debt statement. Therefore, the Ownership Representations do not qualify as "respecting the debtor's . . . financial condition" under the strict definition of that phrase. See Lauer, 371 F.3d at 413-14; Bal-Ross Grocers, Inc. v. Sansoucy (In re Sansoucy), 136 B.R. 20, 23 (Bankr. D. N.H. 1992) ("[A]n oral misrepresentation that certain collateral was free and clear of any liens [i]s actionable under 523(a)(2)(A).").

Similarly, the Repayment Representations are not a statement as to Joelson's overall financial health. Joelson's representation to Cadwell that Cadwell would be able to look to Joelson's brother for repayment is analogous to Joelson's representation to Cadwell that she owned one particular asset. Just as a statement about one of Joelson's assets is not a statement that reflects Joelson's overall financial health, and therefore does not "respect[] the debtor's . . . financial condition," a statement about one part of Joelson's income flow—the flow of funds from her brother—does not reflect Joelson's overall financial

health.  Therefore, the Repayment Representations also are not "respecting the debtor's . . . financial condition."

Because the Ownership and Repayment Representations do not constitute statements "respecting [Joelson's] financial condition," the state court judgment on Cadwell's loan to Joelson is not dischargeable under § 523(a)(2)(A).  Thus, the bankruptcy court and BAP correctly held that the debt owed by Joelson to Cadwell is non-dischargeable under § 523(a)(2)(A).[5]

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the BAP.

---

[5]Debtor also represented that she and Joelene Joelson are the same person (the "Identity Representation").  We refrain from addressing whether the Identity Representation is sufficient to render the state court judgment nondischargeable. Because the bankruptcy court was unable to conclude "whether Jolene or Joelene is simply a name used by [Debtor] or a different person entirely," it is not clear whether the Identity Representation was a false representation as defined by § 523(a)(2)(A) that would bar the state court judgment from being discharged, and we may not attempt to resolve this factual issue.  See Novelly v. Palans (In re Apex Oil Co.), 960 F.2d 728, 731 (8th Cir. 1992) ("If we conclude that the bankruptcy court's findings are silent or ambiguous as to an outcome determinative factual question, we may not make our own findings . . . .").