**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. CC-14-1176-DKiG |
| RITCHIE R. ROBERTS, | Bk. No. 11-59389 |
| Debtor. | Adv. No. 12-01329 |
| RITCHIE R. ROBERTS, | |
| Appellant, | |
| v. | **M E M O R A N D U M**[1] |
| PACIFIC RESOURCE CREDIT UNION, | |
| Appellee. | |

Submitted Without Oral Argument
on January 21, 2016

Filed - January 27, 2016

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Robert N. Kwan, Bankruptcy Judge, Presiding

Appearances:    Andrew Edward Smyth on brief for appellant;
A. Lysa Simon on brief for appellee.

Before: DUNN, KIRSCHER AND GAN,[2] Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

[2] Hon. Scott H. Gan, United States Bankruptcy Judge for the District of Arizona, sitting by designation.

Pre-petition, chapter 7[3] debtor Ritchie R. Roberts applied to Pacific Resource Credit Union (the "Credit Union") for multiple lines of credit and for subsequent increases in those lines of credit. The Credit Union approved the applications, and eventually Mr. Roberts became unable to pay his debts to the Credit Union. After Mr. Roberts filed his chapter 7 petition, the Credit Union brought an adversary proceeding seeking to have Mr. Roberts' debts to it declared nondischargeable. The bankruptcy court, finding that Mr. Roberts had intentionally misrepresented his income and expenses in connection with his credit applications, entered judgment in favor of the Credit Union declaring the debts nondischargeable under § 523(a)(2)(A). Mr. Roberts appeals. We AFFIRM.

## I. FACTUAL BACKGROUND

### A. The underlying debts

#### 1. The credit card

Mr. Roberts became a member of the Credit Union in June 2004, while he was employed as an electrician with BP West Coast Products, LLC ("BP West"). He applied for a credit card, indicating that he was earning $5,000 per month (i.e., $60,000 per year). Based on that income, Mr. Roberts only qualified for a "share secured" credit card, which required him to place funds into a savings account at the Credit Union to be held as collateral. A year later, in August 2005, Mr. Roberts applied for an unsecured credit card ("Credit Card Application"), this

---

[3] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

2

time representing that he was earning $100,000 per year from his job at BP West, plus $80,000 in other income. He also indicated that he was the owner of his home, valued at $60,000, with a mortgage balance of $0 and no monthly payment. The Credit Card Application was approved. In April 2006, Mr. Roberts applied for an increase in his credit limit from $500 to $2,000 ("Credit Card Increase Request"). Based on Mr. Roberts' representation that his income was then $110,000 per year, the Credit Union granted the Credit Card Increase Request.

**2. The HELOC**

In addition to his credit card, Mr. Roberts also applied to the Credit Union for a Home Equity Line of Credit ("HELOC") on November 5, 2005. On his application ("HELOC Application"), Mr. Roberts indicated that his base monthly employment income was $10,000 (i.e., $120,000 per year). Based upon the pay stubs Mr. Roberts submitted with the application, however, the Credit Union concluded that his actual income was significantly less and denied the application. The Credit Union requested additional proof of Mr. Roberts' income, along with his tax returns for 2003 and 2004, to demonstrate job and income stability.

About a month later, Mr. Roberts sent the Credit Union a letter that read as follows: "Here I send you the last statement and also the gross income yearly any questions call me . . . my salary came from $24.00 an hour to $31.65 an hour, also some extra over time worked; help me to make $100,000 a year  Thank you!" (punctuation as in original)  Enclosed with the letter was a document appearing to be a pay statement printed from a BP West computer, which indicated that Mr. Roberts' year-to-date earnings

3

as of December 2, 2005, were $98,416.47. Based on that income figure, taken together with Mr. Roberts' letter stating that his hourly wage had increased recently, the Credit Union decided that Mr. Roberts' $10,000 monthly income, as stated in the HELOC application, was credible after all. Mr. Roberts also submitted documents that he identified as copies of his tax returns from 2003 and 2004, which reflected income of $60,000 during 2003. The Credit Union extended Mr. Roberts a HELOC in the amount of $57,000, secured by a deed of trust on Mr. Roberts' home.

In the summer of 2006, Mr. Roberts submitted an application to have his HELOC credit limit increased from $57,000 to $116,000 ("HELOC Increase Application"). He indicated that he was earning a total of $120,000 per year at BP West, comprising $80,000 base employment income, $30,000 overtime pay and $10,000 in bonuses. He also reported $10,000 per year of rental income. Based on this information, together with the information Mr. Roberts previously had submitted with his original HELOC Application less than a year earlier, the Credit Union agreed to increase Mr. Roberts' HELOC credit limit as requested. The credit balance on Mr. Roberts' original HELOC was paid through this increase.

**3. The state court lawsuit**

Mr. Roberts made payments on the HELOC and on his credit card account for the next several months. Then, in August 2007, he lost his job at BP West, after which he struggled to continue making payments. After October 2007, Mr. Roberts made no further payments on either account. Eight months later, the holder of the first deed of trust on Mr. Roberts' home foreclosed, and the home was sold at a trustee's sale, extinguishing the Credit

4

Union's security interest.

In 2010, the Credit Union sued Mr. Roberts in California state court for breach of contract based on Mr. Roberts' failure to pay amounts due on the credit card account and the HELOC. The state court granted summary judgment in favor of the Credit Union.

**B. Mr. Roberts' bankruptcy case and the adversary proceeding**

**1. Pretrial proceedings**

Soon after the state court announced its decision to enter summary judgment against him, Mr. Roberts filed his chapter 7 petition. The Credit Union filed an adversary complaint seeking to have Mr. Roberts' debts to it declared non-dischargeable. According to the complaint, Mr. Roberts had intentionally and fraudulently overstated his income and understated his expenses in connection with the Credit Card Application, the HELOC Application, the Credit Card Increase Request and the HELOC Increase Application. The Credit Union further alleged that the pay statements and tax forms Mr. Roberts had submitted in support of his applications were "fraudulent" and "counterfeit."

The Credit Union moved for summary judgment or, in the alternative, for partial summary adjudication. The bankruptcy court denied the request for summary judgment but granted partial summary adjudication as to the history of the underlying debts and the amounts owed. The parties proceeded to trial on the remaining issues.

**2. The trial**

At trial, the bankruptcy court heard testimony from Rudy Martin, director of lending and collections at the Credit Union.

5

Mr. Martin testified at length about the Credit Union's criteria for evaluating credit applications and extending credit and in particular about the Credit Union's handling of Mr. Roberts' various credit applications. Mr. Martin told the bankruptcy court that the Credit Union would have denied Mr. Roberts' applications if it had been aware of his actual income and expenses.

Further testimony came from Cheryl Monteleone Rietzel, a representative of BP West, who testified as to Mr. Roberts' actual income as reflected by BP West records. His income, according to Ms. Monteleone, was significantly less than what he represented it to be in connection with his credit applications. She testified that the pay statements Mr. Roberts had submitted with the HELOC Application were not generated by BP West and did not accurately represent his income.

Carl Moen, who had been Mr. Roberts' employer in 2003, testified concerning Mr. Roberts' employment history at his company. Mr. Moen testified that the 2003 tax documents Mr. Roberts had submitted to the Credit Union did not accurately reflect Mr. Roberts' income and work history at Mr. Moen's company.

Mr. Roberts testified in his own behalf. He stated that he had not intended to defraud the Credit Union and that the inaccuracies in his stated income and expenses were inadvertent. Specifically, Mr. Roberts said that he had calculated his income to include deferred and non-cash income, which he asserted would account for the discrepancies pointed out by the Credit Union. As to the allegedly falsified documents, Mr. Roberts denied

having falsified them. With respect to the 2003 tax return, Mr. Roberts testified that the version he had submitted to the Credit Union was genuine, and that the discrepant version the Credit Union introduced at trial - showing far lower income in 2003 - had been a draft that was not submitted to the IRS.

The Credit Union called Mr. Roberts' tax preparer, Richard Vasquez, to rebut Mr. Roberts' testimony regarding the tax forms he had submitted to the Credit Union. Mr. Vasquez testified that the tax preparer's signature on the 2003 tax return Mr. Roberts had submitted to the Credit Union was not his.

### 3. The bankruptcy court's findings and conclusions

After the four-day trial, the bankruptcy court entered extensive findings of fact and conclusions of law ("Findings and Conclusions"). First, the bankruptcy court made findings as to Mr. Roberts' actual income at the relevant times. It concluded that his income did not exceed $81,970.15 in 2005, even when calculated to include deferred income. Mr. Roberts "did not earn $120,000.00 per year for either year 2005 or year 2006 working for BP West." The bankruptcy court further found that Mr. Roberts had access to accurate information concerning his income using his employer's computer system and that he previously had used that system to view his income information.

The bankruptcy court found that Mr. Roberts had made the following misrepresentations in connection with obtaining money and credit from the Credit Union:

(1) In connection with the Credit Card Application and the Credit Card Increase Request, Mr. Roberts misrepresented his income and his mortgage and rental obligations. Specifically, he

7

represented at the time of the Credit Card Application that he had $100,000 of yearly employment income from BP West and $80,000 of other income, and he stated that he had $0 in secured payment obligations related to his residential property. At the time of the Credit Card Increase Request, he represented that he was earning $110,000 per year.

The bankruptcy court went on to make lengthy additional findings concerning Mr. Roberts' actual income and expenses, which differed materially from the figures reported on the Credit Card Application. On the Credit Card Application, Mr. Roberts did not include information concerning his mortgage payments on his home or his payment obligations with respect to any of the rental properties he owned. Specifically with regard to the Credit Card Increase Request, the bankruptcy court found that Mr. Roberts' income at the time was $85,458.25 per year, including deferred income and benefits.

(2) On the HELOC Application, Mr. Roberts misrepresented his income. On the HELOC Application form, Mr. Roberts wrote that his base income at BP West was $120,000 per year, which was much higher than the amount the court found to be his actual income. After the Credit Union had informed Mr. Roberts that the income reflected on his pay stub was insufficient to permit the Credit Union to grant the HELOC, Mr. Roberts responded by providing a false pay stub to support his asserted income, along with a cover letter explaining the discrepancy. The information in the pay statement and cover letter was false.

(3) Again in connection with the HELOC Application, Mr. Roberts misrepresented his work history by submitting an

8

apparently falsified tax return for 2003. Based on a comparison between the tax return Mr. Roberts submitted to the Credit Union and the tax return filed with the IRS, together with the testimony of Mr. Roberts' tax preparer that he did not prepare the questioned return, the bankruptcy court found that the document was falsified.

The bankruptcy court found that Mr. Roberts in fact earned $17,951 in wages in 2003, in contrast to the $60,004 reflected in the false tax return. The court found Mr. Roberts' testimony that the rest of that amount had been earned from another employer, which Mr. Roberts could not identify, was not credible. There was "no reasonable explanation" for the inaccuracy in the false tax return other than that the document was fabricated, either by Mr. Roberts or on his behalf.

(4) When Mr. Roberts applied for the HELOC Increase, he once again misrepresented his income and expenses, this time reporting total income of $120,000 per year from his job with BP West and $10,000 per year of net rental income. The bankruptcy court found that Mr. Roberts' actual income from BP West, even including deferred income, was $15,000 less than represented in the HELOC Increase Application. As to the rental income, the bankruptcy court found that Mr. Roberts experienced a net loss from his rental properties during the relevant period, and even his gross rental income was less than $10,000 based on his tax returns.

In the same application, Mr. Roberts misrepresented his assets and expenses by neglecting to disclose loans he had pledged against his 401(k) account.

9

The bankruptcy court found that Mr. Roberts knew that these representations were false at the time he made them. It also found that Mr. Roberts had made the misrepresentations with the intent to deceive the Credit Union. This determination was supported, the bankruptcy court noted, by the fact that Mr. Roberts had gone "to the extraordinary lengths" of providing false documentation to the Credit Union.

The court found that the Credit Union justifiably (or reasonably[4]) relied on Mr. Roberts' misrepresentations when it granted the Unsecured Credit Card Application, the Credit Card Increase Request and the HELOC Increase Application.[5] The court noted that the Credit Union did not simply rely on Mr. Roberts' application to determine his creditworthiness for the HELOC, nor did it rely solely on the value of the collateral. Instead, it required documentation to support the application. Specifically with regard to the HELOC Increase request, the bankruptcy court found that the Credit Union reasonably relied on the documentation Mr. Roberts had provided with the original HELOC

[4] Throughout its Findings and Conclusions, the bankruptcy court occasionally referred to "reasonable" reliance, as opposed to "justifiable" reliance. As discussed below, the applicable standard is justifiable reliance. To the extent the bankruptcy court made findings as to the stricter standard of reasonable reliance, any error was harmless with respect to Mr. Roberts.

[5] The original HELOC was paid off when the HELOC Increase Application was granted. Therefore, the court had no need to find reliance with respect to the grant of the original HELOC. However, with respect to the HELOC Increase Application, the bankruptcy court found that the Credit Union justifiably relied, among other things, on Mr. Roberts' misrepresentations made in 2005 in connection with the original HELOC Application.

10

Application, as that documentation had been submitted only eight months prior.

The court found that the misrepresentations were material because Mr. Roberts would not have qualified for the credit card or the HELOC on the basis of his true income and expenses.

Finally, the bankruptcy court found that Mr. Roberts' misrepresentations were the cause of the Credit Union's damages "because [Mr. Roberts] did not in fact have the financial resources to repay the amounts loaned and he defaulted on [his obligations]."

In its conclusions of law, the bankruptcy court noted that the adversary complaint did not specify the subsection of § 523 on which the Credit Union was relying for relief. After discussing § 523(a)(2)(A) and (a)(2)(B), the bankruptcy court concluded that the applicable provision of § 523(a)(2) was subdivision (A). It laid out the elements that a plaintiff must prove to prevail on a non-dischargeability claim under § 523(a)(2)(A):

    (1)  misrepresentation, fraudulent omission or
    deceptive conduct by the debtor;
    (2)  knowledge of the falsity or deceptiveness of his
    statement or conduct;
    (3)  an intent to deceive;
    (4)  justifiable reliance by the creditor on the
    debtor's statement or conduct[;] and
    (5)  damage to the creditor proximately caused by its
    reliance on the debtor's statement or conduct.

Based upon its fact findings, the bankruptcy court concluded that the Credit Union had satisfied all five of these elements. Consistent with its Findings and Conclusions, the bankruptcy court entered judgment awarding the Credit Union a total of $165,542.74, including interest and late fees, and declaring that

11

amount non-dischargeable under § 523(a)(2)(A).

This timely appeal followed.

## II.   JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I).  We have jurisdiction under 28 U.S.C. § 158.

## III.   ISSUES

1.   Whether the bankruptcy court erred in applying § 523(a)(2)(A) rather than § 523(a)(2)(B).

2.   Whether the bankruptcy court erred in its application of § 523(a)(2)(A).

## IV.   STANDARDS OF REVIEW

We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo.  Bronitsky v. Bea (In re Bea), 533 B.R. 283, 285 (9th Cir. BAP 2015).  Clear error exists only where the bankruptcy court's factual findings are illogical, implausible or unsupported by inferences that may be drawn from facts in the record.  Americans for Prosperity Found. v. Harris, ___ F.3d ___, ___; 2015 WL 9487728 at *2 (9th Cir. Dec. 29, 2015); United States v. Hinkson, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

## V.   DISCUSSION

**A.   The bankruptcy court properly applied § 523(a)(2)(A) rather than § 523(a)(2)(B)**

The bankruptcy court made it clear that its determination of non-dischargeability was premised on subdivision (A) only and expressly ruled against the Credit Union "to the extent it

12

allege[d] a claim under Section 523(a)(2)(B)."[6]

Section 523(a)(2) creates an exception to discharge for debts incurred "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained" by either of two categories of misrepresentation, which are spelled out in subdivisions (A) and (B) respectively. Subdivision (A) concerns "false pretenses, a false representation, or actual fraud," but expressly excludes "a statement respecting the debtor's or an insider's financial condition." Subdivision (B) covers precisely the ground excluded from subdivision (A) - statements concerning the debtor's or an insider's financial condition - but with certain limitations: (I) the statement must have been in writing; and (ii) the creditor must have reasonably relied on the statement. This second limitation is significant, because liability based on actual fraud under subdivision (A) requires only "justifiable" rather than "reasonable" reliance by the creditor on the debtor's misrepresentation. Field v. Mans, 516 U.S. 59, 74-75 (1995).

For purposes of § 523(a)(2), a "statement respecting the debtor's . . . financial condition" is a statement presenting "a

---

[6] The bankruptcy court stated on page 29 of its Findings and Conclusions: "Defendant is not entitled to discharge his debts owed to the Credit Union on his unsecured credit card account and his July 2006 HELOC pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B)."

Nevertheless, the court went on to state on page 32: "[T]he court determines that the false representations at issue in this case fall within the scope of Section 523(a)(2)(A) rather than Section 523(a)(B) [sic][.]" Notwithstanding this apparent contradiction, it is quite clear that the bankruptcy court based its ultimate determination on subdivision (A) only.

13

picture of the debtor's overall financial health," such as a balance sheet. Barnes v. Belice (In re Belice), 461 B.R. 564, 577-78 (9th Cir. BAP 2011) (quoting Cadwell v. Joelson (In re Joelson), 427 F.3d 700, 714 (10th Cir. 2005)). Such a statement must contain "information as to the debtor's . . . overall net worth or overall income flow." In re Belice, 461 B.R. at 578, quoting In re Joelson, 427 F.3d at 714. Statements that provide some information concerning a debtor's income and expenses do not meet this definition if they do not "reveal anything meaningful or comprehensive about [the debtor's] overall net worth." In re Belice, 461 B.R. at 579.

Here, the information contained in the applications did not present a picture of Mr. Roberts' overall financial health. The applications requested information concerning the debtor's employment income, his rental income, and a subset of his liabilities and expenses, including his monthly mortgage payments and the amount owed on his home loan. This is not equivalent or analogous to a balance sheet. In connection with the applications, the Credit Union did not request, and Mr. Roberts did not provide, comprehensive information about his overall net worth. The bankruptcy court properly concluded that § 523(a)(2)(A), rather than (a)(2)(B), should govern its analysis.[7]

---

[7] Many of Mr. Roberts' arguments on appeal refer to § 523(a)(2)(B). Although he does not expressly argue that the bankruptcy court erred by applying subdivision A, his arguments presuppose as much. Because we have concluded that the bankruptcy court properly excluded subdivision B from its

(continued...)

14

**B.** **The bankruptcy court did not err in its application of § 523(a)(2)(A)**

To establish non-dischargeability under § 523(a)(2)(A) based on actual fraud, a plaintiff must prove each of the following elements by a preponderance of the evidence:

> (1) [T]he debtor made representations;
> (2) that at the time he knew they were false;
> (3) that he made them with the intention and purpose of deceiving the creditor;
> (4) that the creditor relied on such representations; [and]
> (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

Sabban v. Ghomeshi (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010) (internal quotations omitted). The plaintiff also must prove that its reliance on the defendant's representations was justifiable. Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000). As noted above, the bankruptcy court identified these elements and made factual findings regarding each of them.

**1.** **Misrepresentations, knowledge of falsity and intent to deceive**

Mr. Roberts argues that the inaccuracies in the information he provided to the Credit Union were immaterial and inadvertent. Specifically, he argues that, even if his representations of income and expenses were false, they were "substantially true" in that he actually had the ability to repay the extensions of credit at the time. In other words, the substance of

---

[7](...continued)
analysis, we do not address Mr. Roberts' arguments concerning subdivision B any further.

15

Mr. Roberts' representations was that he had the financial wherewithal to repay the Credit Union, and the exact amounts he stated on the application forms should be treated as immaterial details.

Contrary to this argument, Mr. Roberts' representations did not simply equate to a representation of his ability to repay the amounts owed. Rather, he made specific representations of the amounts of his income and expenses, which the bankruptcy court found to be materially false. This finding was based in part on Mr. Martin's detailed testimony regarding the Credit Union's procedures for evaluating credit applications and his statement that Mr. Roberts would not have qualified for any unsecured credit if he had disclosed his income and expenses accurately. We perceive no clear error in the finding that the representations were knowingly and materially false.

Nor are we persuaded that the bankruptcy court clearly erred in finding that Mr. Roberts' false statements were intended to deceive the Credit Union. Mr. Roberts argues that he used a "reasonable method" of calculating his income, which included his anticipated deferred income. But the bankruptcy court spelled out in detail in its Findings and Conclusions that, even giving Mr. Roberts the benefit of every doubt concerning his income calculations, he overstated his income by $15,000 on the HELOC Application. The finding that this misrepresentation was intentionally deceptive was not clearly erroneous.

Much the same can be said regarding Mr. Roberts' failure to disclose his mortgage obligations on the Credit Card

16

Application.  Although Mr. Roberts argues that his omission of some of these obligations was due to confusion regarding the application form, the bankruptcy court did not clearly err by finding that his representation of $0 in mortgage payment obligations was intentionally deceptive.  See Citibank (South Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1089 (9th Cir. 1996) (omission can constitute misrepresentation when there is a duty to disclose).

### 2. Justifiable reliance

Next, Mr. Roberts argues that the bankruptcy court erred in its finding that the Credit Union justifiably relied on Mr. Roberts' misrepresentations.  He argues that the proper standard is that of the "ordinary and average person."  Although it is true that "reasonable reliance" under § 523(a)(2)(B) is judged by the standard of the "reasonably prudent person," see Heritage Pac. Fin., LLC v. Machuca (In re Machuca), 483 B.R. 726, 736 (9th Cir. BAP 2012), that standard does not apply under § 523(a)(2)(A).  Rather, the "less demanding" standard of "justifiable reliance" applies.  Field v. Mans, 516 U.S. at 439.

"Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case[.]"  Id. at 444 (quoting Restatement (Second) of Torts § 545A, cmt b).  Although a creditor "cannot purport to rely on preposterous representations," it "ordinarily has no duty to investigate the truth of a representation[.]"  In re Eashai, 87 F.3d at 1090-91 (quoting Romesh Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte), 180 B.R. 223, 229 (9th Cir. BAP 1995)).

17

Here, the Credit Union did not rely on "preposterous representations." Mr. Roberts has not shown that the Credit Union had any reason to doubt the truth of his representations of income and expenses. With respect to the HELOC Application and the HELOC Increase Application, the Credit Union relied on pay statements and tax returns whose authenticity it had no reason to doubt at the time. The bankruptcy court did not err in finding that the Credit Union justifiably relied on these representations.

### 3. Causation

Finally, Mr. Roberts argues that the bankruptcy court's analysis of the causation element was flawed. He argues that the Credit Union's loss was not the result of his misrepresentations. Rather, it was the loss of his job at BP West that caused him to cease making payments, and at that point he would have been unable to make the payments even if his income initially had been as high as he represented it to be.

There is no need to indulge in speculation about what would have happened if Mr. Roberts' income had been as high as he told the Credit Union it was. Nor is the bankruptcy court's finding of causation undermined by the fact that Mr. Roberts' job loss immediately precipitated his inability to pay his debts to the Credit Union. The bankruptcy court found, with ample support from the record, that the Credit Union would have denied Mr. Roberts' credit applications if it had known the true state of his income and expenses. Indeed, this is precisely what happened when Mr. Roberts first applied for the unsecured credit card and the HELOC. It was only after he supplied false

18

information that the Credit Union changed its decisions. If the Credit Union had not extended credit to Mr. Roberts, he could not have defaulted.

Mr. Roberts then argues that his omission of any mention of his mortgage obligations on the Credit Card Application was not the cause of the Credit Union's loss, because the Credit Union would have approved the Credit Card Application even if he had disclosed the existence of his mortgage. But the bankruptcy court never found that this misrepresentation, standing alone, was the cause of the Credit Union's loss in its entirety. What the court found was that, "had the Credit union known [Mr. Roberts'] actual income and his outstanding debt obligations, [he] would not have qualified for any unsecured credit from the Credit Union." This finding was not clearly erroneous.

## VI. CONCLUSION

Based on the foregoing, we conclude that the bankruptcy court did not err in its legal conclusions, nor did it clearly err in its factual findings. We AFFIRM.

19